[No. B078210. Second Dist., Div. Five. Feb. 23, 1994.]

CROWN HOMES, INC., et al., Plaintiffs and Appellants, v.
NEIL LANDES et al., Defendants and Respondents.

**[Opinion certified for partial publication.\*]**

---

\*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication except parts II(A)-II(D) and II(F).

1274

**COUNSEL**

Endman, Lincoln, Turek & Heater, Linda B. Reich and Henry E. Heater for Plaintiffs and Appellants.

Sheppard, Mullin, Richter & Hampton, Don T. Hibner, Jr., Dani Jo Merryman and Samantha M. Phillips for Defendants and Respondents.

## OPINION

## TURNER, P. J.—

### I. BACKGROUND

This is an appeal from a judgment granting a motion to confirm an arbitration award pursuant to Code of Civil Procedure section 1286.[1] Plaintiffs are seven residents of the Stallion Meadows Mobile Home Park: Lydia McGregor; Barbara Robinson; Michael Robinson; David Seim; Pamela Seim; Jerald Vincent; and Marilyn Jewell-Vincent as well as two corporate mobilehome dealerships, Apple Homes, Inc., and Crown Homes, Inc. The complaint named as defendants: Neil Landes; Cynthia Landes; and Ernest Goldenfeld; the general partners of Goldland Associates (Goldland), which in turn is alleged to be the developer and owner of Stallion Meadows Mobile Home Park (Stallion). The complaint also named as defendants: L.C. Homes Inc., a mobilehome dealer; L.C. Manufactured Housing, Inc.; and Manufactured Housing Construction, Inc.[2] Plaintiffs alleged that defendants violated state antitrust laws under the Cartwright Act (Bus. & Prof. Code, § 16700 et seq.) by illegally tying the lease of space in the park to the purchase of mobilehomes and "dig-in" packages from L.C. Homes, Inc. As a result, plaintiffs alleged they were forced to pay higher than market prices for their mobilehomes and dig-in packages. Apple Homes and Crown Homes alleged they were precluded from selling mobilehomes to be placed in the park. The resident plaintiffs also asserted that Mr. Landes, Mr. Goldenfeld, and Mr. Goldland violated Civil Code sections 798.37 and 798.31, which are part of California's Mobilehome Residency Law. (Civ. Code, § 798 et seq.)

In February 1992, defendants filed a motion to compel arbitration as to the *resident* plaintiffs. Commissioner Robert W. Zakon granted the motion and the arbitration began on October 19, 1992, before retired Judge Leon Savitch. On April 6, 1993, the arbitrator issued an award in favor of defendants in a "Report of Arbitration Proceedings and Statement of Decision by Arbitrator" which was subsequently modified by letter dated May 26, 1993. Defendants moved to confirm the award. Plaintiffs moved to vacate it on the grounds the arbitrator exceeded his powers under California law and the arbitration agreement. The trial court denied plaintiffs' motion to vacate the award; granted defendants' motion to confirm the award; and entered judgment on August 9, 1993, in defendants' favor. Plaintiffs filed a timely appeal

---

[1] Unless otherwise indicated, all future statutory references are to the Code of Civil Procedure.

[2] Plaintiffs voluntarily dismissed the complaint against defendant Manufactured Housing Construction, Inc.

from the judgment. In the published portion of his opinion, we hold that antitrust claims arising under the Cartwright Act (Bus. & Prof. Code, § 16700 et seq.) are arbitrable. In so concluding, we disagree with the holding of *Bos Material Handling, Inc.* v. *Crown Controls Corp.* (1982) 137 Cal.App.3d 99, 109-112 [186 Cal.Rptr. 740], not because it was wrongly decided in 1982, but the authority it relied upon is no longer viable and persuasive by reason of subsequent United States Supreme Court decisions.

## II. DISCUSSION

### A.-D.*

. . . . . . . . . . . . . . . . . . . . . . . . .

### E. *Arbitration of an Antitrust Cause of Action*

██ Plaintiffs argue the arbitration agreement in the leases violated California law insofar as it allowed the parties to agree to arbitrate an antitrust cause of action contrary to the decision of *Bos Material Handling, Inc.* v. *Crown Controls Corp.*, *supra*, 137 Cal.App.3d at pages 109-112. *Bos* held that it would "follow the mainstream of judicial thought . . . [and conclude] parties . . . cannot agree privately to exclude antitrust issues under the Cartwright Act from judicial scrutiny and determination." (*Id.* at p. 111, fn. omitted.) The prevailing judicial thought to which *Bos* referred to was *American Safety Equipment Corp.* v. *J. P. Maguire & Co.* (2d Cir. 1968) 391 F.2d 821, 825-828 and *Wilko* v. *Swan* (1953) 346 U.S. 427, 437-438 [98 L.Ed. 168, 176-177, 74 S.Ct. 182].[11] *American Safety* held ". . . the pervasive public interest in enforcement of the [Sherman Anti-Trust Act], and the nature of the claims that arise in such cases, combine to make . . . antitrust claims . . . inappropriate for arbitration." (*American Safety Equipment Corp.* v. *J.P. Maguire & Co.*, *supra*, 391 F.2d at pp. 827-828.) *Wilko* held a securities dispute was not arbitrable. (*Wilko* v. *Swan*, *supra*, 346 U.S. at p. 438 [98 L.Ed. at p. 177].)

To begin with, *American Safety* is no longer viable authority. As discussed below, plaintiffs' assertion that *Bos* controls the disposition of this case is unpersuasive. This is because the "mainstream of judicial thought" relied on in *Bos* has since changed course with the advent of the United States Supreme Court decision of *Mitsubishi Motors* v. *Soler Chrysler-Plymouth*

---

*See footnote, *ante*, page 1273.

[11]The *Bos* court also cited two Ninth Circuit cases, *A. & E. Plastik Pak Co.* v. *Monsanto Company* (9th Cir. 1968) 396 F.2d 710, 715-716 and *Power Replacements, Inc.* v. *Air Preheater Co.* (9th Cir. 1970) 426 F.2d 980, 983-984, both of which relied upon *American Safety*.

(1985) 473 U.S. 614, 628-629 [87 L.Ed.2d 444, 456-457, 105 S.Ct. 3346], which although not directly overruling *American Safety*, discussed and rejected its analysis. *Mitsubishi* concluded that nothing in the federal antitrust laws prohibited parties from agreeing to arbitrate antitrust claims which arose out of international commercial transactions. (*Ibid.*) Although the court found it unnecessary to resolve the legitimacy of the *American Safety* doctrine as it applied to agreements to arbitrate disputes arising out of domestic transactions, the court "confess[ed] to some skepticism of certain aspects of the *American Safety* doctrine." (*Id.* at p. 632 [87 L.Ed.2d at pp. 458-459].) At another point, the *Mitsubishi* court noted the "absence of any explicit support for such an exception [to the general rule providing for arbitrations] in either the Sherman Act or the Federal Arbitration Act." (*Id.* at pp. 628-629 [87 L.Ed.2d at pp. 456-457].)

*Mitsubishi* declared that the *American Safety* doctrine was premised upon the following four considerations: first, ". . . private parties play a pivotal role in aiding governmental enforcement of the antitrust laws by means of the private action for treble damages"; second, " 'the strong possibility that contracts which generate antitrust disputes may be contracts of adhesion militates against automatic forum determination by contract' "; third, antitrust issues which are prone to complexity, require sophisticated legal and economic analysis, and are therefore " 'ill-adapted to strengths of the arbitral process, *i. e.*, expedition, minimal requirements of written rationale, simplicity, resort to basic concepts of common sense and simple equity' "; and fourth, "just as 'issues of war and peace are too important to be vested in the generals, . . . decisions as to antitrust regulation of business are too important to be lodged in the arbitrators chosen from the business community . . . .' " (*Mitsubishi Motors* v. *Soler Chrysler-Plymouth, supra,* 473 U.S. at p. 632 [87 L.Ed.2d at pp. 458-459], original italics.)

The *Mitsubishi* court then proceeded to address each of these ingredients and found them unpersuasive in terms of prohibiting arbitration of antitrust disputes arising from international business transactions. (*Mitsubishi Motors* v. *Soler Chrysler-Plymouth, supra,* 473 U.S. at pp. 632-640 [87 L.Ed.2d at pp. 458-464].) First, in terms of the role of the treble damage provisions of the Sherman Act, being part of the national policy designed to enforce antitrust laws, the *Mitsubishi* court held: "The importance of the private [treble-]damages remedy, however, does not compel the conclusion that it may not be sought outside an American court. Notwithstanding its important incidental policing function, the treble-damages cause of action conferred on private parties by § 4 of the Clayton Act, 15 U.S.C. § 15, and pursued by [the defendant] by way of its third counterclaim, seeks primarily to enable an injured competitor to gain compensation for that injury. [¶] 'Section 4 . . . .

is in essence a remedial provision.' " (*Id.* at p. 635 [87 L.Ed.2d at pp. 460-461].) The *Mitsubishi* court stated the second concern cited in *American Safety* relating to adhesion contracts was unjustified because the mere appearance of an antitrust dispute did not warrant invalidation of arbitration as a selected forum when there was no showing or basis for assuming the arbitral process was inadequate or unfair. (*Id.* at pp. 632-633 [87 L.Ed.2d at pp. 458-459].) The court also rejected the notion that the potential complexity of the issues was sufficient "to ward off arbitration." (*Id.* at p. 633 [87 L.Ed.2d at p. 459].) *Mitsubishi* further concluded that an arbitration panel did not "pose too great a danger of innate hostility to the constraints on business conduct that antitrust law imposes." (*Id.* at p. 634 [87 L.Ed.2d at pp. 459-460].) In so doing, the court "decline[d] to indulge the presumption that the parties and arbitral body conducting a proceeding will be unable or unwilling to retain competent, conscientious, and impartial arbitrators." (*Ibid.*) Finally, the court concluded that the core of *American Safety* doctrine —the importance of private damages remedies in enforcing the antitrust laws—did not warrant the conclusion that the remedy may not be sought outside the American courts. (*Id.* at pp. 634-635 [87 L.Ed.2d at pp. 459-461].) Accordingly, the *Mitsubishi* court held American courts should "enforce an agreement to resolve antitrust claims by arbitration when that agreement arises from an international transaction." (*Id.* at pp. 624, 639-640 [87 L.Ed.2d at pp. 453, 463-464]).[12]

The United States Supreme Court subsequently applied the principles of *Mitsubishi* in the context of domestic securities transactions to hold that claims under the Securities Act of 1933 were arbitrable, thereby overruling *Wilko* v. *Swan, supra,* 346 U.S. at page 438 [98 L.Ed.2d at page 177] which was the second major case relied upon by Bos. (See *Rodriguez de Quijas* v. *Shearson/Am. Exp.* (1989) 490 U.S. 477, 479-485 [104 L.Ed.2d 526, 533-537, 109 S.Ct. 1917].) The Supreme Court also applied *Mitsubishi* to hold that claims under the Securities Exchange Act of 1934 and the Racketeer Influenced and Corrupt Organizations Act were arbitrable. (*Shearson/American Express Inc.* v. *McMahon* (1987) 482 U.S. 220, 227-242 [96 L.Ed.2d 185, 194-204, 107 S.Ct. 2332].) Likewise, California courts have concluded securities claims are arbitrable, thereby disregarding *Wilko*. (*Baker* v. *Aubry* (1989) 216 Cal.App.3d 1259, 1266 [265 Cal.Rptr. 381] [citing *Shearson/American Express, Inc.* v. *McMahon, supra,* 482 U.S. at pp. 226-227 (96 L.Ed.2d at pp. 193-194)]; *Elliot* v. *Albright* (1989) 209 Cal.App.3d 1028, 1033-1037 [257 Cal.Rptr. 762].)

More importantly, however, the federal courts have interpreted *Mitsubishi* and its progeny to have eroded *American Safety* in the case of domestic

---

[12]Plaintiffs have failed to explain why the policies of the Sherman Act and the Federal Arbitration Act are furthered by resolution of international trade antitrust dispute in the arbitral arena but frustrated by arbitration of such disputes arising from domestic contracts.

transactions and concluded that such antitrust claims are subject to arbitration. (See *Kowalski* v. *Chicago Tribune Co.* (7th Cir. 1988) 854 F.2d 168, 173 ["An argument could be made that arbitrators are not authorized to decide questions of federal antitrust law with binding effect, and at one time the argument would have carried the day [citations]—but no longer" because of *Mitsubishi.*]; *Western Intern. Media Corp.* v. *Johnson* (S.D.Fla. 1991) 754 F. Supp. 871, 873-874 ["[T]he Court's reliance on arbitration principles and the legislative histories of antitrust provisions suggests that the result arrived at in *Mitsubishi* would be forthcoming in the domestic situation."]; *Hough* v. *Merrill Lynch, Pierce, Fenner & Smith* (S.D.N.Y. 1991) 757 F.Supp. 283, 286 affirmed *sub nom. Hough* v. *Merrill Lynch* (S.D.N.Y. 1992) 946 F.2d 883 ["[I]t seems unlikely that the principle of *Mitsubishi* will be limited to international transactions."]; *GKG Caribe, Inc.* v. *Nokia-Mobira, Inc.* (D.Puerto Rico 1989) 725 F.Supp. 109, 111 ["Legal developments occurring after [*American Safety*] have significantly eroded its vitality to the extent that the Supreme Court, if confronted squarely with the issue of its continued applicability, would most certainly discard said doctrine."]; *Gemco Latinoamerica, Inc.* v. *Seiko Time Corp.* (S.D.N.Y. 1987) 671 F.Supp. 972, 980 [Given the *Mitsubishi* ruling, "none of the justifications for the *American Safety* doctrine retain their vigor and . . . our Court of Appeals would now hold that domestic antitrust claims are subject to arbitration."].

Other courts have questioned whether *American Safety* is any longer reliable authority, given the analysis in *Mitsubishi.* (*Mayaja, Inc.* v. *Bodkin* (5th Cir. 1986) 803 F.2d 157, 162-163, fn. 6 ["*Mitsubishi* rejected so much of *American Safety*'s reasoning it is difficult to say what is left of the opinion to rely on."]; *Smoky Greenhaw Cotton Co., Inc.* v. *Merrill Lynch* (W.D.Texas 1986) 650 F.Supp. 220, 222 ["[T]he analytical framework set out in *Mitsubishi Motors* should not be strictly limited to situations involving international disputes and is equally applicable to domestic statutory claims."].) Further, commentators have noted that the rationale of *American Safety* is of doubtful continuing validity given the *Mitsubishi* holding. (Comment, *Arbitrating Civil RICO and Implied Causes of Action Arising Under Section 10(b) of the Securities Exchange Act of 1934* (1987) 36 Cath. U.L.Rev. 455, 480 [the *Mitsubishi* court "not only strongly criticized the *American Safety* exception to the Arbitration Act, but held that all federal statutory rights may be arbitrable unless expressly indicated to the contrary by Congress." (fn. omitted)]; Kanowitz, *Alternative Dispute Resolution and the Public Interest: The Arbitration Experience* (1987) 38 Hastings L.J. 239, 262 [the *Mitsubishi* court "rejected the rationale of *American Safety* . . ."]; Allison, *Arbitration Agreements and Antitrust Claims: The Need for Enhanced Accommodation of Conflicting Public Policies* (1986) 64 N.C. L.Rev. 219, 235, fn. 123 [the *Mitsubishi* decision "cast doubt on some of the rationales that had been employed to deny arbitrability to domestic antitrust claims."].)

■ The California Supreme Court has held because "the Cartwright Act is patterned after the Sherman Act (15 U.S.C. § 1 et seq.), federal cases interpreting the Sherman Act are applicable in construing our state laws. [Citation.]" (*Mailand* v. *Burckle* (1978) 20 Cal.3d 367, 376 [143 Cal.Rptr. 1, 572 P.2d 1142], fn. omitted.) In this case, we decline to breath life into all but defunct *American Safety* doctrine because of the existence of *Bos*, a decision which predates *Mitsubishi, McMahon,* and *Rodriguez.*

■ Additionally, there is nothing in the arbitration statutes or the Cartwright Act which indicates that an antitrust claim is not arbitrable. In construing a statute, our responsibility is as follows: " 'The fundamental purpose of statutory construction is to ascertain the intent of the lawmakers so as to effectuate the purpose of the law. [Citations.] In order to determine this intent, we begin by examining the language of the statute. [Citations.] But "[i]t is a settled principle of statutory interpretation that language of a statute should not be given a literal meaning if doing so would result in absurd consequences which the Legislature did not intend." ' [Citation.]" (*People* v. *King* (1993) 5 Cal.4th 59, 69 [19 Cal.Rptr.2d 233, 851 P.2d 27].) In *Lungren* v. *Deukmejian* (1988) 45 Cal.3d 727, 735 [248 Cal.Rptr. 115, 755 P.2d 299], our Supreme Court held: "Words used in a statute . . . should be given the meaning they bear in ordinary use. [Citations.] If the language is clear and unambiguous there is no need for construction, nor is it necessary to resort to indicia of the intent of the Legislature . . . [Citations.] [¶] But the 'plain meaning' rule does not prohibit a court from determining whether the literal meaning of a statute comports with its purpose or whether such a construction of one provision is consistent with other provisions of the statute. The meaning of a statute may not be determined from a single word or sentence; the words must be construed in context, and provisions relating to the same subject matter must be harmonized to the extent possible. [Citation.] Literal construction should not prevail if it is contrary to the legislative intent apparent in the statute. The intent prevails over the letter, and the letter will, if possible, be so read as to conform to the spirit of the act. [Citations.] An interpretation that renders related provisions nugatory must be avoided [citation]; each sentence must be read not in isolation but in the light of the statutory scheme [citation]; and if a statute is amenable to two alternative interpretations, the one that leads to the more reasonable result will be followed [citation]." It is with these thoughts in mind that we examine the language of the arbitration statutes and the Cartwright Act.

To begin with, the type of controversy which is subject to the arbitration statutes is very broad. Section 1280 defines in pertinent part the types of disputes which are subject to the arbitration statutes as follows: "As used in this title: [¶] . . . [¶] . . . [c] 'Controversy' means *any questions* arising

between parties to an agreement whether such question is one of law or of fact or both." (Italics added.) The broad nature of the enforceability of arbitration agreements is described in section 1281 as follows: "A written agreement to submit to arbitration an existing controversy or a controversy thereafter arising is valid, enforceable and irrevocable, save upon grounds as exist for the revocation of any contract." Section 1281 does not exclude written agreements to submit controversies concerning potential violations of the Cartwright Act from the scope of the arbitration statutes. Further, section 1281.2, sets forth other statutory exceptions to the duty of a trial court to order arbitration of a controversy. A Cartwright Act dispute is not listed in section 1281.2.[13] Also, section 1281.5, subdivision (b) provides for a special waiver rule that comes into play when a party fails to seek arbitration of a dispute subject to a mechanic's lien. Accordingly, none of the provisions which relate to the enforcement of arbitration agreements contain an exception for disputes premised upon the Cartwright Act.

In addition to the foregoing statutory language, our Supreme Court has repeatedly emphasized the strong public policy in favor of arbitration. In *Moncharsh* v. *Heily & Blase* (1992) 3 Cal.4th 1 at page 9 [10 Cal.Rptr.2d 183, 832 P.2d 899], our Supreme Court held: "Title 9 of the Code of Civil

[13]Section 1281.2 states: "On petition of a party to an arbitration agreement alleging the existence of a written agreement to arbitrate a controversy and that a party thereto refuses to arbitrate such controversy, the court shall order the petitioner and the respondent to arbitrate the controversy if it determines that an agreement to arbitrate the controversy exists, unless it determines that: [¶] (a) The right to compel arbitration has been waived by the petitioner; or [¶] (b) *Grounds exist for the revocation of the agreement.* [¶] (c) A party to the arbitration agreement is also a party to a pending court action or special proceeding with a third party, arising out of the same transaction or series of related transactions and there is a possibility of conflicting rulings on a common issue of law or fact. For purposes of this section, a pending court action or special proceeding includes an action or proceeding initiated by the party refusing to arbitrate after the petition to compel arbitration has been filed, but on or before the date of the hearing on the petition. This subdivision shall not be applicable to an agreement to arbitrate disputes as to the professional negligence of a health care provider made pursuant to Section 1295. [¶] If the court determines that a written agreement to arbitrate a controversy exists, an order to arbitrate such controversy may not be refused on the ground that the petitioner's contentions lack substantive merit. [¶] If the court determines that there are other issues between the petitioner and the respondent which are not subject to arbitration and which are the subject of a pending action or special proceeding between the petitioner and the respondent and that a determination of such issues may make the arbitration unnecessary, the court may delay its order to arbitrate until the determination of such other issues or until such earlier time as the court specifies. [¶] If the court determines that a party to the arbitration is also a party to litigation in a pending court action or special proceeding with a third party as set forth under subdivision (c) herein, the court (1) may refuse to enforce the arbitration agreement and may order intervention or joinder of all parties in a single action or special proceeding; (2) may order intervention or joinder as to all or only certain issues; (3) may order arbitration among the parties who have agreed to arbitration and stay the pending court action or special proceeding pending the outcome of the arbitration proceeding; or (4) may stay arbitration pending the outcome of the court action or other special proceeding."

Procedure, as enacted and periodically amended by the Legislature, represents a comprehensive statutory scheme regulating private arbitration in this state. (§ 1280 et seq.) Through this detailed statutory scheme, the Legislature has expressed a 'strong public policy in favor of arbitration as a speedy and relatively inexpensive means of dispute resolution.' [Citations.] Consequently, courts will ' "indulge every intendment to give effect to such proceedings." ' [Citations.] Indeed, more than 70 years ago this court explained: 'The policy of the law in recognizing arbitration agreements and in providing by statute for their enforcement is to encourage persons who wish to avoid delays incident to a civil action to obtain an adjustment of their differences by a tribunal of their own choosing.' [Citations.] 'Typically, those who enter into arbitration agreements expect that their dispute will be resolved without necessity for any contact with the courts.' [Citation.]"

Additionally, there is nothing in the Cartwright Act to suggest that resolution of disputes arising from it must be resolved in a court of law rather than by means of arbitration. (Bus. & Prof. Code, § 16700 et seq.) Moreover, a careful review of the language in the arbitration agreement in the present care indicates that there is no evidence of a desire that antitrust disputes be excluded from the scope of arbitral resolution. Section 41.1 of the lease agreement provided: "It is agreed that any dispute between us with respect to the provisions of this Agreement and tenancy in the Park shall be submitted to arbitration conducted under the provisions of *Code of Civil Procedure* section 1280 *et seq*." Section 41.2 of the lease agreement contains the only exceptions to the arbitration clause and it stated: "The only non-arbitration exceptions are any contested rights of owner which relate to: (a) termination of tenancy due to (i) failure to pay rent or other charges under *Civil Code* section 798.56(d), (ii) for substantial annoyance to other home-owners, other residents or others under *Civil Code* section 798.56(b); (b) forceable detainer; (c) injunctive relief pursuant to (i) *Code of Civil Procedure* section 527.6, or (ii) *Civil Code* section 798.87(b), or (iii) payment of the maintenance fee provided for in *Civil Code* section 798.36, or (iv) condemnation or a change of the use of the Park as provided in *Civil Code* section 798. 56(e) and (f), or (v) to preserve the equitable rights appertaining to any arbitrable dispute before resolution by arbitration. All other disputes of any kind, excepting the foregoing exceptions set forth in this subparagraph 41.2, shall be subject to arbitration." Finally, section 41.3 of the lease provided in pertinent part: " 'Dispute' includes by way of illustration, but is not limited to . . . business administration or practices of the owner; . . . . 'Dispute' includes not only disputes you may have with us, but also disputes against any of our contractors or agents." Clearly, there is nothing in the language of the contract which would exclude disputes concerning the Cartwright Act.

To sum up, plaintiffs' Cartwright Act claims are subject to the arbitration agreement in the present case. *Bos Material Handling, Inc.* v. *Crown Controls Corp.*, *supra*, 137 Cal.App.3d at pages 109-112, while certainly consistent with the mainstream of judicial thought at the time it was decided, no longer is. Intervening United States Supreme Courts decisions have rendered it no longer probative and persuasive authority. Also, there is nothing in the language of the arbitration statute or the Cartwright Act which supports plaintiffs' argument that antitrust violations are not subject to arbitration. Further, the California Supreme Court has repeatedly emphasized the strong public policy favoring arbitration. Finally, the arbitration agreement with its broadly inclusive language did not exclude antitrust violations from the scope of the type of disputes which would be arbitrable. It is for these combined reasons that we affirm the order of the trial court.

F.  *The Mobilehome Residency Law**

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

### III.  DISPOSITION

The judgment is affirmed. All defendants shall separately recover their costs on appeal jointly and severally from all plaintiffs.

Armstrong, J., and Godoy Perez, J., concurred.

A petition for a rehearing was denied March 11, 1994, and appellants' petition for review by the Supreme Court was denied May 19, 1994. Mosk, J., was of the opinion that the petition should be granted.

---

*See footnote, *ante*, page 1273.