Filed 12/27/18; Certified for publication 1/15/19 (order attached)

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| SAN DIEGANS FOR OPEN GOVERNMENT, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> CITY OF SAN DIEGO, <br><br> Defendant and Respondent, <br><br> SYMPHONY ASSET POOL XVI, LLC, <br><br> Real Party in Interest and Respondent. | D073284 <br><br><br> (Super. Ct. No. 37-2015-00015780-CU-TT-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, Judith Hayes, Judge. Affirmed.

Briggs Law Corporation, Cory Briggs and Anthony N. Kim for Plaintiff and Appellant.

Troutman Sanders LLP, Peter N. Villar and Michael J. Whitton for Real Party in Interest and Respondent.

Office of the San Diego City Attorney, Mara W. Elliott and M. Travis Phelps for Defendant and Respondent.

San Diegans for Open Government (SDOG) appeals from an adverse judgment in its lawsuit challenging an amended and restated lease that the City of San Diego (City) entered into with Symphony Asset Pool XVI, LLC (Symphony) to lease City-owned land containing an oceanfront amusement park in San Diego's Mission Beach neighborhood, and potentially extending the term of a prior lease of the premises for a significant additional period.  Specifically, SDOG contends (1) the City's approval of the amended and restated lease violates Proposition G, passed by the City's electorate in 1987, to limit commercial development on the premises; (2) the City improperly concluded that its decision to enter into the amended and restated lease was exempt from the requirements of the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.) (CEQA) because it concerned an existing facility; and (3) the City violated section 99 of its charter (as it existed at the time) by failing to publish notice in the official City newspaper and pass an ordinance prior to entering into the amended and restated lease.

We conclude that SDOG's arguments lack merit.  Accordingly, we affirm the judgment.

I.

FACTUAL AND PROCEDURAL BACKGROUND

A.    *The Development of Belmont Park*

In 1925, a parcel of oceanfront property in San Diego was developed by John D. Spreckels as an amusement park, which is now commonly referred to as Belmont Park.

2

Two of the original amusement attractions still existing at the site today are the Plunge indoor swimming pool (the Plunge) and the Giant Dipper roller coaster (Roller Coaster). Upon Spreckels's death, the entire amusement center was granted to the City for the enjoyment of its people.  In 1973, the City passed an ordinance naming the property on which Belmont Park stands, along with additional adjacent land, as Mission Beach Park and dedicated it to be used for park and recreational purposes.[1]

B.  *The 1987 Lease*

In order to revitalize and renovate an aging Belmont Park, on March 5, 1987, the City entered into a lease agreement with Belmont Park Associates (the 1987 Lease).

Attached to the 1987 Lease was a Development Plan for the premises.  Among other things, the Development Plan described the remodeling and improvement of the building that housed the Plunge, along with "[f]our new buildings . . . constructed around the new Plunge facility, separated by a courtyard.  These buildings will house restaurants and shops for food and beverages and other recreational and/or visitor-serving commercial uses."  It also stated that "[t]he existing roller rink building will be demolished and replaced with three new buildings containing restaurants and shops for food and beverages and other recreational and/or visitor-serving commercial uses."  The Development Plan further provided for parking and pedestrian-related improvements, the

---

[1]     According to documents in the record, it appears that excluding the Roller Coaster footprint, Belmont Park is located on approximately seven acres, the Roller Coaster is located on approximately an additional one acre, and the entire area of Mission Beach Park, which includes Belmont Park, the Roller Coaster, public park areas and a parking lot, consists of a total area of approximately 17 acres.

renovation of a lifeguard building, with an extension that would include restrooms, and new landscaping, fountains, plazas and benches.[2]

The parties agreed in the 1987 Lease that "the Premises are leased . . . for park and recreation uses, specifically for the construction, operation and maintenance of a park/visitor oriented commercial and recreational center, as described in the Development Plan . . . , and for such other related or incidental purposes as may be first approved in writing by the City Manager, which approval shall not be unreasonably withheld, and for no other purpose whatsoever."

The Development Plan attached to the 1987 Lease set forth the following description of contemplated uses:

> "Uses contemplated for the project shall be visitor-oriented commercial and recreational uses. The following uses have been approved:
>
> "—Recreational
>
> "—Retail, including, but not limited to, novelty, sporting goods, sports equipment rental, apparel, art, liquor stores, health foods, takeout foods, liquor, bakeries, floral shops, book stores, card shops, and party supplies, provided that such uses shall accommodate the needs of park visitors and shall be operated in a manner to cater to such needs.
>
> "—Restaurants, full service and fast foods, including sale of alcoholic beverages, operated in a manner appropriate to serve the desires of park visitors.

---

[2] The 1987 Lease did not encompass the Roller Coaster, which, at the time, was governed by a different lease. Subsequently, in August 1989, the City authorized a 31-year lease agreement with an entity to restore, operate and maintain the Roller Coaster. Also in August 1989, the City accepted the donation of the roller coaster from the Save the Coaster Committee.

4

"—Food stores which include food items used by families on outings, as fresh fruits, delicatessen items, soft drinks, and alcoholic beverages.

"—Drug stores which sell suntan lotions and other items normally used in beach activities.

"—Travel agents, sports medicine, and other visitor-oriented services, operated in a manner appropriate to serve the desires of park visitors.

"—Such other visitor-oriented commercial and recreational uses as many be approved by the City Manager. Any use not disapproved within ten (10) business days after receipt by City Manager shall be deemed approved so long as such use is a valid park use and in conformance with the approved Development Plan.

"All uses shall be conducted in a manner so as to conform to all applicable laws."

The 1987 Lease was for a term of 50 years, and it gave Belmont Park Associates the right of first refusal to enter into a new lease for the premises upon such terms and conditions as were determined appropriate in the sole discretion of the City, contingent upon a finding by the City that it is desirable and in the public's best interest to continue the uses of the property as specified in the lease. The 1987 Lease further provided that in the event the parties are unable to agree upon terms and conditions for a new lease within a specified time period, the City could lease the premises to another party.

The 1987 Lease provided that upon its expiration or termination, any improvements, trade fixtures, structures and installations or additions to the premises would become, at the City's option, the City's property, or if the City elected not to assume ownership, would be removed at the cost of the lessee.

5

C.    *Proposition G*

On November 3, 1987, several months after the execution of the 1987 Lease, the City's electorate voted in favor of Proposition G, which limited the development of Mission Beach Park.[3]  As stated in the ballot argument in favor of the proposition, "Your public parkland is being turned into a shopping center.  Commercial development in Mission Beach Park must be limited to truly recreational and visitor-serving parkland uses, and the historical remnants of the Mission Beach Amusement Center (Belmont Park) must be preserved."

As now codified in the San Diego Municipal Code, Proposition G provides:

"(a) From and after the effective date of this measure, the Mission Beach Park property owned by the City of San Diego shall be restricted to the following uses:

"(1) Public park and recreation uses such as grass, picnic areas, public open space, public parking, public recreation and meeting facilities. Expressly excluded are retail and commercial uses except within a historically rehabilitated Plunge Building which would serve park and beach visitors, such as restaurants, fitness center and the like.

"(2) Historical preservation uses, such as preservation and rehabilitation of the historic Plunge Building, Roller Rink Building and Roller Coaster where economically feasible.

"(3) Incidental and related uses to those uses authorized by [(1)] and [(2)] above provided such incidental and related uses are clearly subordinate to the authorized uses and are minor in nature."  (San Diego Mun. Code, § 63.50(a).)

Proposition G also included exemption "Exemptions for Certain Projects."

---

3    Proposition G is codified as San Diego Municipal Code section 63.50, and we refer to the municipal code citations in identifying the specific provisions of Proposition G.

6

"(f) Exemptions for Certain Projects.  This measure shall apply to all proposed development or redevelopment of Mission Beach Park except a development or redevelopment proposal which has obtained a 'vested right' as of the effective date of this measure. For purposes of this measure, a 'vested right' shall have been obtained only if each of the following criteria is met:

"(1) The project has received its final discretionary approval; and

"(2) Substantial expenditures have been incurred in good faith reliance on the final discretionary approval; and

"(3) Substantial construction has been performed on the property in good faith reliance on the final discretionary approval.

"The 'substantiality' of the expenditures incurred and of construction performed and the question of whether or not such expenditures and construction were in 'good faith' are questions of fact to be determined on a case by case basis by the City Council following application by the landowner or developer and upon notice to the interested public, and following public hearing."  (San Diego Mun. Code, § 63.50(f).)

On March 22, 1988, the City Council adopted a resolution finding that the Roller Coaster could continue commercial operation under two different provisions of Proposition G.  Specifically, the City Council concluded (1) Proposition G expressly identified the economically feasible operation of the Roller Coaster as a permitted use of Mission Beach Park; and (2) the Roller Coaster had obtained a vested right to continue commercial operation according to the requirements for a "vested right" set forth in Proposition G.

On April 18, 1988, the City Council adopted a resolution determining that the Belmont Park Associates project had obtained a vested right under Proposition G to operate in Mission Beach Park because prior to the effective date of Proposition G in November 1987 (1) the project had received final discretionary approval; (2) Belmont

7

Park Associates had incurred substantial expenditures; and (3) substantial construction had occurred.

In 1989, to reflect Proposition G, the City Council approved the amendment of the community planning document covering the Mission Beach neighborhood, known as the Mission Beach Precise Plan. Among other things, the Mission Beach Precise Plan was amended to state, "In conformance with [Proposition G], Mission Beach Park has been rezoned to Open Space-Resource (OS-R) as a resource based park, except for the Plunge Building/Fitness Center which has been rezoned to Commercial Recreation (CR). Development is to be guided by the Council-approved City lease and development plan until expiration of the lease on March 31, 2037." As amended, the Mission Beach Precise Plan sets forth the following recommendation: "That upon completion of the term of the city lease, future development of Mission Beach Park be restricted to public and recreation uses and shall not include commercial uses except within the Plunge building. Until the term of the lease, and any expiration rights conferred by the lease, is completed, the Council-approved and vested development plan shall guide the development of the site."

D.    *The Restated Lease with Symphony*

Throughout the next years, the 1987 Lease was assigned several times to a succession of different lessees. In November 2012, Symphony became the lessee under the 1987 Lease. Symphony also acquired the entity that was the current lessee and operator of the Roller Coaster.

8

On April 6, 2015, after considering the matter at a public meeting, the City Council voted 7 to 2 to adopt a resolution authorizing the mayor to execute an amended and restated lease between the City and Symphony to lease Belmont Park and the Roller Coaster. The mayor approved the resolution on April 21, 2015, and it became effective on April 22, 2015.

Also, on April 6, 2015, the City Council adopted a resolution determining that the approval of the amended and restated lease was categorically exempt from CEQA under the exemption for existing facilities set forth in section 15301 of the CEQA Guidelines (Cal. Code Regs., tit. 14, § 15301 ("section 15301")). The resolution was approved by the mayor on April 21, 2015, and it became effective on April 22, 2015.

The City and Symphony entered into an amended and restated lease on April 22, 2015 (the Restated Lease). Among other things, the Restated Lease required Symphony to pay the City an annual rent for its use of the premises commonly known as Belmont Park, and it gave Symphony the opportunity to obtain an extended lease term. As set forth in the Restated Lease, "LESSEE has requested this Lease in part to support LESSEE's investment of Eighteen Million Dollars ($18,000,000) in capital improvements and upgrades to the Premises. LESSEE will make certain structural repairs, upgrades and improvements to the Plunge Swimming Pool and Plunge Swimming Pool building estimated to cost approximately Five Million Nine Hundred Thousand Dollars ($5,900,000) . . . The 'Plunge Refurbishment' . . . will be in addition to LESSEE's investment of $18,000,000 in capital improvements and upgrades to the Premises as described above."

9

The parties agreed that the initial term of the Restated Lease would expire on June 30, 2038, which they agreed was the expiration date of the 1987 Lease, but the term of the Restated Lease could be extended if Symphony completed certain improvements to the premises and made an additional lump-sum payment to the City. Specifically, the Restated Lease recited that as of the effective date of the Restated Lease, Symphony had already expended at least $18 million to improve and upgrade the premises.[4] According to the Restated Lease, after Symphony completed the $18 million in improvements, completed the approximate $5.9 million in refurbishments to the Plunge, and paid the City a lump sum of $500,000, the remaining term of the Restated Lease would be 40 years. Further, the Restated Lease provided that Symphony may obtain an additional 10-year extension of the lease term (for a total term of 50 years) if, during the extended 40-year term, Symphony makes an additional $5 million in capital improvements to the premises, which must first be reviewed and approved by the City.[5]

The Restated Lease required Symphony to operate and maintain the Plunge and the Roller Coaster. It also provided for the following uses of the premises:

---

[4] The $18 million of improvements and upgrades already accomplished by Symphony were described in Exhibit F to the Restated Lease.

[5] The additional $5 million in capital improvements are described in the Restated Lease as being for the following possible purposes: "(a) additional food-serving facilities, retail shops, rides, attractions, games which result in an increase of [Symphony's] Gross Revenue . . . ; (b) improvements, enhancement and/or renovation of existing attractions, landscaping, parking area, food facility, retail shops, but only to the extent that such improvements add new features to an existing element and are not solely for repair and maintenance purposes; and (c) improvements that increase the safety and security of the Premises, patrons and employees."

10

"Subject to all applicable laws, rules, regulations, directives and approvals . . . LESSEE may use the Premises only for the following purposes . . .

"(a) Operation, maintenance and improvement of a park/visitor oriented commercial and recreational center, including full-service and fast-food restaurants, coffee shops and catering facilities, including without limitation alcoholic beverage service, amusement rides, fairly-run games of skill and other such experiences (e.g., carnival rides, games and attractions) and other amusements such as miniature golf, laser tag and climbing walls;

"(b) Operation and maintenance of water-theme features;

"(c) Operation and maintenance of fitness facilities and the Plunge Swimming Pool;

"(d) Operation and maintenance of retail shops, such as shops for the sale of clothing, souvenirs, gifts, novelties, sundries and specialty items;

"(e) Bicycle and aquatic equipment rentals;

"(f) Beverage and snack vending machines;

"(g) Automated teller machines;

"(h) Operation and maintenance of parking facilities for use by LESSEE's invitees, guests, licensees, sublessees and the general public;

"(i) Subject to CITY's annual prior written consent, on a lease-year to lease-year basis, operation and maintenance of up to nine (9) valet parking stalls and a valet pick-up/drop-off area . . . ; and

"(j) All uses approved by CITY in writing prior to the Effective Date and allowed as of the Effective Date under all applicable laws, rules, regulations and directives of competent governmental authorities."

The Restated Lease also provided for uses relating to the operation of the Roller Coaster, and stated that the City "may approve additional Allowed Uses from time to time in City's sole discretion," which shall be "conducted in compliance with all applicable laws, rules, regulations and directives of competent governmental authorities."

11

E.    *SDOG's Lawsuit*

On May 11, 2015, SDOG filed a petition for writ of mandate and complaint for declaratory and injunctive relief against the City (the complaint), naming Symphony as a real party in interest. The complaint made three allegations that are relevant here. First, the complaint alleged that the City's approval of the Restated Lease violated Proposition G "because it authorizes uses and improvements in excess of those protected by the vested rights conferred under the 1987 Lease and those codified in the Mission Beach Precise Plan." Second, the complaint alleged that in approving the Restated Lease, the City violated CEQA because it improperly concluded that its approval of the Restated Lease was exempt from environmental review. Third, the complaint alleged that the City's approval of the Restated Lease violated section 99 of the City's charter, as it existed at the time, requiring publication of notice in the City's official newspaper and the passage of an ordinance before the City authorizes a "contract, agreement or obligation extending for a period of more than five years."[6]

The parties proceeded by way of written briefing to the trial court, including the submission of an administrative record and requests for judicial notice. After considering the parties' submissions and holding a hearing, the trial court ruled against SDOG, concluding that none of its claims had merit.

---

6    The complaint also alleged that the Restated Lease violates the California Coastal Act (Pub. Resources Code, § 30600) because no coastal development permit was obtained, but SDOG did not further advance that claim during the trial court proceedings.

12

## II.

## DISCUSSION

A.    *SDOG's Contention that the Restated Lease Violates Proposition G*

We first consider SDOG's argument that by entering into the Restated Lease, the City violated Proposition G.

1.    *Standard of Review*

As an initial matter we discuss the legal standards applicable to our review of SDOG's contention that Proposition G prohibited the City from entering into the Restated Lease.  The parties agree that SDOG's challenge to the Restated Lease based on Proposition G should be analyzed pursuant to the rules governing a petition for writ of mandate, as SDOG seeks an order compelling the City, a governmental entity, to act in a specific manner.  However, both parties incorrectly identify this action as governed by the rules pertaining to a petition for administrative mandamus (Code Civ. Proc., § 1094.5), rather than by the rules pertaining to a petition for ordinary (or traditional) mandamus (*id*., § 1085).[7]

"Statutes provide for two types of review by mandate:  ordinary mandate and administrative mandate.  (Code Civ. Proc., §§ 1085, 1094.5.)  The nature of the administrative action or decision to be reviewed determines the applicable type of mandate.  . . .  In general, quasi-legislative acts are reviewed by ordinary mandate and

_____

[7]    SDOG's complaint did not specify whether it purported to proceed under administrative mandamus or traditional mandamus, and SDOG's briefing in the trial court did not clarify the matter with respect to the arguments based on Proposition G and the City's charter.

13

quasi-judicial acts are reviewed by administrative mandate. . . . But judicial review via administrative mandate is available 'only if the decision[ ] resulted from a 'proceeding in which by law:  1) a hearing is required to be given, 2) evidence is required to be taken, and 3) discretion in the determination of facts is vested in the agency.' "  (*Bunnett v. Regents of University of California* (1995) 35 Cal.App.4th 843, 848, citations omitted and italics omitted.)  "There are subtle differences in the scopes of judicial review for ordinary and administrative mandate.  In general, when review is sought by means of ordinary mandate the inquiry is limited to whether the decision was arbitrary, capricious, or entirely lacking in evidentiary support; when review is sought by means of administrative mandate the inquiry is directed to whether substantial evidence supports the decision."  (*Id*. at p. 849.)

Here, the City's act of entering into the Restated Lease was a legislative act, and thus was subject to challenge in a petition for ordinary writ of mandamus.  " 'A public entity's "award of a contract, and all of the acts leading up to the award, are legislative in character." . . . "[T]he letting of contracts by a governmental entity necessarily requires an exercise of discretion guided by considerations of the public welfare." (*San Diegans for Open Government v. City of San Diego* (2016) 245 Cal.App.4th 736, 739, 740 (*San Diegans for Open Government*) ["Contrary to SDOG's assertion, the city council's approval of the lease between City and [the operator of a hotel] was legislative, and not adjudicatory, in nature."].)  Further, a petition for administrative mandate is not appropriate here because the process of entering into the Restated Lease did not involve a

14

hearing at which "evidence is required to be taken."  (Code Civ. Proc., § 1094.5, subd. (a).)

Review of a local entity's legislative determination through ordinary mandamus under Code of Civil Procedure section 1085 " ' "is limited to an inquiry whether the action was arbitrary, capricious or entirely lacking in evidentiary support." ' "  (*San Diegans for Open Government, supra*, 245 Cal.App.4th at p. 740.)  " 'This test has also been formulated to add an inquiry whether the agency's decision was "contrary to established public policy or unlawful or procedurally unfair." ' "  (*Weinstein v. County of Los Angeles* (2015) 237 Cal.App.4th 944, 964.)  "On appeal, we generally determine de novo the question of law whether the agency's decision was arbitrary, capricious, or entirely lacking in evidentiary support.  . . .  However, if the trial court's findings on foundational matters of fact may be conclusive on appeal, we review those findings for substantial evidence to support them."  (*San Diegans for Open Government,* at p. 740, citation omitted.)

> 2. *The Restated Lease Agreement Falls Within the Vested Right Determined by the City Council in 1988*

SDOG makes two arguments to support its contention that the Restated Lease violates Proposition G:  (1) the scope of work allowed by the Restated Lease exceeds the vested rights determined by the City in 1988; and (2) the extension of the Restated Lease to a possible 50-year term exceeds the vested rights obtained in 1988.

15

a.     *Work Exceeding Any Vested Right*

SDOG contends that the Restated Lease "calls for work exceeding any 'vested right' acquired by Symphony or its predecessor in interest under the [1987 Lease]." According to SDOG, Symphony may not "piggy-back[]" on the vested rights obtained by Belmont Park Associates in 1988 when the City found a vested right in the project described in the 1987 Lease because, as SDOG contends, the Restated Lease "allows uses that were never granted under the [1987 Lease] such as construction of new restaurants, amusement rides, carnival rides, miniature golf, laser tag, wall-climbing, an arcade, and a zip-lining attraction, among others."  Put simply, SDOG contends that the Restated Lease authorizes "Allowed Uses" that were not contained in the 1987 Lease, so that no such vested right to those uses exists.

As we will explain, we reject the argument because it ignores the broad language of the 1987 Lease, which encompasses all of the uses specifically set forth in the Restated Lease.  As stated in Proposition G, the exemption for projects with vested rights applied to "*a development or redevelopment proposal* which has obtained a 'vested right' as of the effective date of this measure."  (San Diego Mun. Code, § 63.50(f), italics added.) Therefore, to determine the scope of the vested rights obtained by Belmont Park Associates, as determined by the City Council in the 1988 ordinance, we look to the *development proposal* that existed in 1987.

The 1987 Lease stated that the premises would be leased "for park and recreation uses, specifically for the construction, operation and maintenance of a park/visitor oriented commercial and recreational center, as described in the Development Plan . . .,

16

and for such other related or incidental purposes as may be first approved in writing by

the City Manager, which approval shall not be unreasonably withheld, and for no other

purpose whatsoever."  The Development Plan stated that "[u]ses contemplated for the

project shall be visitor-oriented commercial and recreational uses," and it set forth a list

of specifically approved uses:

"—Recreational

"—Retail, including, but not limited to, novelty, sporting goods, sports
equipment rental, apparel, art, liquor stores, health foods, takeout foods,
liquor, bakeries, floral shops, book stores, card shops, and party supplies,
provided that such uses shall accommodate the needs of park visitors and
shall be operated in a manner to cater to such needs.

"—Restaurants, full service and fast foods, including sale of alcoholic
beverages, operated in a manner appropriate to serve the desires of park
visitors.

"—Food stores which include food items used by families on outings, as
fresh fruits, delicatessen items, soft drinks, and alcoholic beverages.

"—Drug stores which sell suntan lotions and other items normally
used in beach activities.

"—Travel agents, sports medicine, and other visitor-oriented services,
operated in a manner appropriate to serve the desires of park visitors.

"—Such other visitor-oriented commercial and recreational uses as many
be approved by the City Manager. Any use not disapproved within ten (10)
business days after receipt by City Manager shall be deemed approved so
long as such use is a valid park use and in conformance with the approved
Development Plan.

"All uses shall be conducted in a manner so as to conform to all applicable
laws."

The Development Plan further allowed "[s]uch other visitor-oriented commercial

and recreational uses as many be approved by the City Manager."

17

SDOG focuses on the "construction of new restaurants, amusement rides, carnival rides, miniature golf, laser tag, wall-climbing, an arcade, and a zip-lining attraction" in arguing that the uses identified in the Restated Lease are not within the vested rights obtained pursuant to the 1987 Lease. However, each one of the uses identified by SDOG plainly falls within the categories of allowed uses set forth in the 1987 Lease, namely "[r]estaurants, full service and fast foods" and "[r]ecreational."

In support of its argument that the Restated Lease exceeds the type of development permitted under Proposition G, SDOG relies heavily on the statement in Proposition G stating that "expressly excluded" from its restrictions "are retail and commercial uses except within a historically rehabilitated Plunge Building which would serve park and beach visitors, such as restaurants, fitness center and the like." (San Diego Mun. Code, § 63.50(a)(1).) SDOG argues that most of the improvements to Belmont Park described in the Restated Lease are not *in the Plunge building*, and thus are not allowed by Proposition G. However, the exception in Proposition G involving the Plunge building is *separate and in addition to* the exemption for development proposals that obtained a vested right as of the effective date of Proposition G. Because we conclude that the improvements identified in the Restated Lease fall within the scope of the vested rights obtained by Belmont Park Associates, it is irrelevant whether the improvements are located in the Plunge building. The 1987 Lease, and the vested rights it created, cover the entire premises of Belmont Park.

In a related contention, SDOG argues that the Restated Lease exceeds the vested rights set forth in the 1987 Lease because it states that "City may approve additional

18

Allowed Uses from time to time in City's sole discretion." SDOG contends that any additional allowed uses subsequently approved cannot have been vested as of the time of Proposition G because, otherwise, "why would the City Council need to exercise its discretion to approve the use anew?"

This argument fails because it ignores the fact that although the Restated Lease provides that the City "may approve additional Allowed Uses from time to time in City's sole discretion," it qualifies this statement by providing that all additional allowed uses shall be "conducted in compliance with all applicable laws, rules, regulations and directives of competent governmental authorities." Proposition G and the 1988 Ordinance determining that Belmont Park Associates had a vested right in the development proposal set forth in the 1987 Lease comprise part of the "applicable laws, rules, regulations and directives" that govern the type of improvements that can be made to Belmont Park. Accordingly, any additional allowed uses that the City approves in the future must be within the scope of the vested rights defined by the development proposal in the 1987 Lease. Although it is entirely speculative that Symphony will attempt to add allowed uses not consistent with the development proposal in the 1987 Lease, if any such uses are approved by the City, SDOG or another group may take action at that time by challenging the City's approval as inconsistent with Proposition G and the 1988 ordinance granting vested rights in the Belmont Park project.

b. *Extension of Lease Term*

SDOG argues that it was a violation of Proposition G for the Restated Lease to provide for an extension of the term of the 1987 Lease, which expired in 2038, to a

19

potential term of 50 years from the date certain preconditions are satisfied. For this argument, SDOG relies on two documents, which it interprets as establishing that Belmont Park Associates obtained the vested right to operate the project described in the 1987 Lease only until the end of the term of the 1987 Lease, and that the vested rights to operate the project on the premises could not continue indefinitely.

First, SDOG refers to language in a document titled "Description of the Belmont Park Redevelopment Plan" prepared by Belmont Park Associates in July 1986 while the 1987 Lease was still being negotiated, and approximately eight months before the 1987 Lease was executed in March 1987. In describing the economic benefits of the project to the City, the document states, "No funding would be required from the City. The developer would finance the entire project. The property and all the improvements would revert to the City upon termination of the 50 year lease."

The document does not support SDOG's attempt to establish that Belmont Park Associates obtained a vested right to operate the project described in the 1987 Lease *only* for a period of 50 years, with no possibility of extension. The document does not purport to be a binding statement on the terms of the parties' eventual agreement in the 1987 Lease. Instead, the document is a *rough* description of the terms that Belmont Park Associates *expected* to be contained in the 1987 Lease. The 1987 Lease itself governs the terms of the parties' agreement and provides more relevant detail. As we have described, the 1987 Lease stated that although it was for a term of 50 years, Belmont Park Associates had the right of first refusal to enter into a new lease for the premises upon such terms and conditions as were determined appropriate in the sole discretion of the

20

City, contingent upon a finding by the City that it was desirable and in the public's best interest to continue the uses of the property as specified in the lease. The 1987 Lease further provided that the City could lease the premises to another entity if the parties were unable to agree upon terms and conditions for a new lease. As respondents properly point out, "the [1987 Lease] proves that the City never intended for the Belmont Park development to include a fixed, inflexible [50] year term with an immediate reversion."

Second, SDOG relies on the Mission Beach Precise Plan to argue that the vested right to operate the premises as described in the 1987 Lease continued only until the expiration of the 50 year term of the 1987 Lease. Specifically, SDOG relies on the statement that in Mission Beach Park, "[d]evelopment is to be guided by the Council-approved City lease and development plan until expiration of the lease on March 31, 2037."[8] SDOG contends that this statement establishes that after the expiration of the 1987 Lease, no vested right will exist to use the premises in the manner set forth in the 1987 Lease.

We reject the argument because the Mission Beach Precise Plan does not purport to address the issue of vested rights. Instead, the statement is most reasonably understood as observing that *at least* until the expiration of the 1987 Lease, its terms will guide the

---

[8] The March 31, 2037 expiration date of the 1987 Lease identified in the Mission Beach Precise Plan is different from the expiration date of June 30, 2038, which the Restated Lease identifies as the 1987 Lease's expiration date. We express no view on the correct expiration date, which is defined in the 1987 Lease as follows: "The term of this Lease shall be fifty (50) years commencing on the first day of the calendar month following the receipt of all discretionary approvals required by governmental authorities having jurisdiction to approve same . . . or July 1, 1988, whichever date or event first occurs."

21

development of Belmont Park, so that any community planning document must be consistent with the 1987 Lease and its development plan during that term. Another statement in the Mission Beach Precise Plan is more specific to the issue, but it is expressly presented only as a *recommendation* for future limitation on development, not a statement as to whether a vested right will exist after the expiration of the 1987 Lease. The Mission Beach Precise Plan *recommends* "[t]hat upon completion of the term of the city lease, future development of Mission Beach Park be restricted to public and recreation uses and shall not include commercial uses except within the Plunge building. Until the term of the lease, and any expiration rights conferred by the lease, is completed, the Council-approved and vested development plan shall guide the development of the site." To the extent the Mission Beach Precise Plan might be understood as making *a legally binding* statement as to whether vested rights may exist after the expiration of the 1987 Lease, rather than a *recommendation* for further development, it does not control. Indeed, the Mission Beach Precise Plan states that "[w]hile this Plan sets forth many proposals for implementation, it does not establish new regulations or legislation, nor does it rezone property." The legally controlling documents in this case are Proposition G and the City's 1988 ordinance determining that Belmont Park Associates obtained a vested right in the development proposal set forth in the 1987 Lease.[9]

---

[9] The parties both extensively discuss *Pardee Construction Co. v. California Coastal Com.* (1979) 95 Cal.App.3d 471, 474, as it also concerns a determination that a party has obtained a vested right to use land in a certain way despite the passage of a law restricting that use. Specifically, in *Pardee* the developer of a condominium complex obtained a determination that it had a vested right to continue construction without a

22

In sum, the language of Proposition G itself grants a vested right to a "development proposal," not merely to a lease agreement for a term of 50 years relating to that development. (San Diego Mun. Code, § 63.50(f).) Further, Proposition G contains no temporal limitation on the vested right exemption, and the 1988 ordinance determining that Belmont Park Associates obtained a vested right contains no time limitation on that right. Therefore, based on the plain meaning of Proposition G, and the terms of the 1988 ordinance, as long as the development proposed in the 1987 Lease continues to be located in Belmont Park and the City chooses to extend the terms of the lease, a vested right exists for the project to continue within the scope described in the 1987 Lease and the project remains exempt from the limitations on development set forth in Proposition G.

B.    *The City Properly Concluded That the Approval of the Restated Lease Was Exempt From CEQA*

On April 22, 2015, the City Council adopted a resolution determining that the approval of the Restated Lease was categorically exempt from CEQA environmental review under the exemption for existing facilities set forth in section 15301 of the CEQA

permit from a regional commission despite the intervening passage of the California Coastal Zone Conservation Act of 1972, which would otherwise have required the developer to obtain a permit. (*Id*. at pp. 474-475.) The issue in *Pardee* was whether the expiration of a city building permit required the developer to apply for a new permit from the state commission under the newly enacted California Coastal Act of 1976 even though it previously had a permit and obtained a vested right from the regional commission under the previous law. (*Id*. at pp. 476-482.) Although the factual circumstances of *Pardee* and this case are similar in that they both involve a vested right determination based on construction already underway when a new law was passed, we do not find *Pardee* to be particularly instructive on the issues presented here.

23

Guidelines (hereafter section § 15301).[10] SDOG contends that the City incorrectly determined that approval of the Restated Lease was exempt from CEQA environmental review under that provision.

1.  *Standard of Review*

Public Resources Code section 21168.5 provides the standard of review in CEQA challenges, where, as here, no evidentiary hearing was required. (*Berkeley Hillside Preservation v. City of Berkeley* (2015) 60 Cal.4th 1086, 1110-1111 (*Berkeley Hillside*).) Under that provision, a court's inquiry is "whether there was a prejudicial abuse of discretion. Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence." (Pub. Resources Code, § 21168.5.) "In a CEQA case, as in other mandamus cases, our review of the administrative record for error is the same as the trial court's; we review the agency's action, not the trial court's decision." (*Muzzy Ranch Co., supra*, 41 Cal.4th at p. 381.)

2.  *The Existing Facilities Exception Applies*

Section 15301 provides an exemption from environmental review for the "operation, repair, maintenance, permitting, leasing, licensing, or minor alteration of

---

10    Under CEQA, for any project, the agency must decide whether the project is exempt from the CEQA review process based on either a statutory exemption (see Pub. Resources Code, § 21080) or a categorical exemption set forth in the CEQA Guidelines. (see Pub. Resources Code, § 21084, subd. (a); Cal. Code Regs., tit. 14, § 15300 et seq.) If the agency determines the project is exempt, there is no further environmental review. (*Muzzy Ranch Co. v. Solano County Airport Land Use Com.* (2007) 41 Cal.4th 372, 380 (*Muzzy Ranch*).)

existing public or private structures, facilities, mechanical equipment, or topographical features, involving negligible or no expansion of use beyond that existing at the time of the lead agency's determination."  (§ 15301.)  The regulation provides the following relevant examples of the types of projects which might fall within the exception:

> "(a) Interior or exterior alterations involving such things as interior partitions, plumbing, and electrical conveyances;

> [¶] . . . [¶]

> "(d) Restoration or rehabilitation of deteriorated or damaged structures, facilities, or mechanical equipment to meet current standards of public health and safety, unless it is determined that the damage was substantial and resulted from an environmental hazard such as earthquake, landslide, or flood;

> "(e) Additions to existing structures provided that the addition will not result in an increase of more than:

>> "(1) 50 percent of the floor area of the structures before the addition, or 2,500 square feet, whichever is less; or

>> "(2) 10,000 square feet if:

>> "(A) The project is in an area where all public services and facilities are available to allow for maximum development permissible in the General Plan and

>> "(B) The area in which the project is located is not environmentally sensitive."  (§ 15301.)

SDOG contends that the Restated Lease does not qualify for the existing facilities exemption "for the simple reason that it involves construction of a new restaurant and bar, new food court venues, and a new arcade."  SDOG argues that Symphony would not "be willing to pay construction costs in excess of $25 million for 'negligible or no expansion of the use existing' at the Project site."

25

The relevant issue in determining whether the existing facilities exemption applies is whether the project involves "expansion of use beyond that *existing at the time of the lead agency's determination.*" (§ 15301, italics added.) Here, at the time the City made its CEQA determination in April 2015, the $18 million in improvements described in the Restated Lease had already been completed and, accordingly, were existing facilities. Specifically, the parties acknowledge in the Restated Lease that as of the effective date of the Restated Lease, Symphony had already expended at least $18 million to improve and upgrade the premises. The $18 million of improvements and upgrades already accomplished by Symphony were described in Exhibit F to the Restated Lease, which listed the construction of a restaurant in an existing building, improvements to food court venues, and tenant improvements to the arcade, and installation of a new zip-line attraction. Although the Restated Lease also contemplates Symphony investing approximately $5.9 million in refurbishments to the Plunge, which were not yet completed at the time of the Restated Lease, SDOG does not argue that those refurbishments fall outside the existing facilities exemption. Indeed, the exhibit to the Restated Lease listing the expected refurbishment to the already-existing Plunge facility does not identify the construction of any new structures, but only refurbishment of a preexisting facility, including replacement of structural steel, resurfacing of the swimming pool, replacement of the roof, replacement of windows, and installation of a new ventilation system. Such activity falls squarely within the existing facilities exemptions as set forth in section 15301.

26

Relying on case law dealing with the issue of whether a CEQA challenge can be rejected as moot when construction has occurred *while CEQA litigation was pending*, SDOG contends that it is not relevant that the $18 million in improvements were completed prior to the City's approval of the Restated Lease.  (*Woodward Park Homeowners Ass'n v. Garreks, Inc.* (2000) 77 Cal.App.4th 880, 888 [rejecting a city's argument that the case was moot because a carwash project was constructed and operating prior to the trial court's decision on the petition challenging the city's issuance of a mitigated negative declaration, because "a decision upholding the court's order directing the preparation of an EIR could result in modification of the project to mitigate adverse impacts or even removal of the project altogether"].)  The case law that SDOG cites is inapposite because it does not deal with the issue of whether the existing facilities exemption applies, but rather with the issue of whether a CEQA litigation becomes moot when the project is completed *during* the litigation.  In this case, the existing facilities exemption applied from the time that the Restated Lease was approved, and the City made its CEQA determination because all of the structures at issue were already completed.

3.     *SDOG Has Not Established Unusual Circumstances*

SDOG contends that even if the City's approval of the Restated Lease falls under the exemption for existing facilities, the unusual circumstances exception in section 15300.2, subdivision (c) of CEQA Guidelines applies.  (Cal. Code Regs., tit. 14, § 15300.2, subd. (c).)

Under that provision, "[a] categorical exemption shall not be used for an activity where there is a reasonable possibility that the activity will have a significant effect on the environment due to unusual circumstances."  (Cal. Code Regs., tit. 14, § 15300.2, subd. (c).)  As our Supreme Court has explained, "The plain language of this provision supports the view that, for the exception to apply, it is not alone enough that there is a reasonable possibility the project will have a significant environmental effect; instead, in the words of the Guidelines, there must be 'a reasonable possibility that the activity will have a significant effect on the environment *due to unusual circumstances*.' "  (*Berkeley Hillside, supra*, 60 Cal.4th at pp. 1097-1098.)  Accordingly, the unusual circumstances exception "requir[es] more than a showing of a fair argument that the proposed activity may have a significant environmental effect."  (*Id*. at p. 1102.)[11]  Only "*if* 'unusual

---

[11]     "[B]oth prongs of [Public Resources Code] section 21168.5's abuse of discretion standard apply on review of an agency's decision with respect to the unusual circumstances exception.  The determination as to whether there are 'unusual circumstances' . . . is reviewed under section 21168.5's substantial evidence prong.  However, an agency's finding as to whether unusual circumstances give rise to 'a reasonable possibility that the activity will have a significant effect on the environment' . . . is reviewed to determine whether the agency, in applying the fair argument standard, 'proceeded in [the] manner required by law.' "  (*Berkeley Hillside, supra*, 60 Cal.4th at p. 1114, citations omitted.)

28

circumstances' are established, [should] an agency . . . apply the fair argument standard in determining whether there is 'a reasonable possibility' that those circumstances will produce 'a significant effect' within the meaning of CEQA." (*Id*. at p. 1117, italics added.)

"As to projects that meet the requirements of a categorical exemption, a party challenging the exemption has the burden of producing evidence supporting an exception." (*Berkeley Hillside, supra*, 60 Cal.4th at p. 1105.) "A party invoking the exception may establish an unusual circumstance without evidence of an environmental effect, by showing that the project has some feature that distinguishes it from others in the exempt class, such as its size or location. In such a case, to render the exception applicable, the party need only show a reasonable possibility of a significant effect due to that unusual circumstance. Alternatively, . . . a party may establish an unusual circumstance with evidence that the project will have a significant environmental effect. That evidence, if convincing, necessarily also establishes 'a reasonable possibility that the activity will have a significant effect on the environment due to unusual circumstances.' " (*Ibid*.)

Here, SDOG contends both that (1) unusual circumstances exist; and (2) due to those unusual circumstance there is a reasonable possibility that the activity will have a significant effect on the environment. We reject the argument. SDOG has not identified any unusual circumstances due to which there may be a significant effect on the environment.

29

First, SDOG contends that the single unusual circumstance present here is that the electorate passed Proposition G to govern the development of Mission Beach Park. SDOG argues, "unusual circumstances exist here because the City's voters used the initiative power, in conjunction with [the Mission Beach Precise Plan] to declare that it had a distinct interest in minimizing the environmental impacts in this particular part of the City." Specifically, SDOG quotes the portion of the Mission Beach Precise Plan which recommends "any future plan for the site should ensure that the facility will not have a negative impact upon Mission Beach in terms of noise, traffic, parking or intensity of development and use."

Second, SDOG argues that "[t]here is a fair argument that the Project will result in severe traffic and noise impacts." The sole support SDOG provides for that statement is a representation by Symphony at the City Council hearing to approve the Restated Lease that "this new lease guarantees the City more than $100 million in revenues over the course of the term of the lease." SDOG argues, "That significant revenue could only be generated as a result of a significant increase in the number of visitors to the Project site. There is a fair argument that such an increase would result in a significant noise and traffic impact."

We reject SDOG's attempt to establish the unusual circumstances exception for two reasons. First, it is entirely speculative whether the Restated Lease will result in a significant increase in visitors, and whether, in turn, the increase in visitors will result in increased traffic and noise. The sole fact cited by SDOG—that the City will obtain over $100 million in revenues over the course of the lease—does not establish that the

30

Restated Lease will result in increased traffic and noise. SDOG presents an extremely undeveloped and conclusory argument on the issue. Second, even if there was evidence to support SDOG's contention that the Restated Lease will result in increased traffic and noise, SDOG has made no attempt to show that the increased traffic and noise would be due to the unusual circumstances that it cites, namely the existence of Proposition G. In order for the unusual circumstances exception to apply, the significant environmental effect must be *due to* the unusual circumstance. (Cal. Code Regs., tit. 14, § 15300.2, subd. (c); *Berkeley Hillside, supra*, 60 Cal.4th at p. 1105.) No such causal connection has been identified.

In sum, we find no merit to SDOG's contention that the City improperly concluded that its approval of the Restated Lease was exempt from CEQA under the exemption for existing facilities.

C.      *The City Acted in Conformance with Its Charter by Entering into the Restated Lease Without First Publishing Notice in the Newspaper and Adopting an Ordinance*

Finally, we consider SDOG's contention that because the Restated Lease was for a term exceeding five years, the City acted in violation of section 99 of its charter by

31

failing to give public notice and failing to adopt an ordinance (rather than a resolution) before entering into the Restated Lease Agreement.[12]

As it existed in 2015 when the Restated Lease was executed, section 99 of the City's charter provided as follows:

"Section 99: Continuing Contracts

"The City shall not incur any indebtedness or liability in any manner or for any purpose exceeding in any year the income and revenue provided for such year unless the qualified electors of the City, voting at an election to be held for that purpose, have indicated their assent as then required by the Constitution of the State of California, nor unless before or at the time of incurring such indebtedness provision shall be made for the collection of an annual tax sufficient to pay the interest on such indebtedness as it falls due, and also provision to constitute a sinking fund for the payment of the principal thereof, on or before maturity, which shall not exceed forty years from the time of contracting the same; provided, however, anything to the contrary herein notwithstanding, when two or more propositions for incurring any indebtedness or liability are submitted at the same election, the votes cast for and against each proposition shall be counted separately, and when the qualified electors of the City, voting at an election for that purpose have indicated their assent as then required by the Constitution of the State of California, such proposition shall be deemed adopted. *No contract, agreement or obligation extending for a period of more than five years may be authorized except by ordinance adopted by a two-thirds' majority vote of the members elected to the Council after holding a public hearing which has been duly noticed in the official City newspaper at least ten days in advance.*"  (Former San Diego City Charter, § 99 (hereafter former section 99), italics added).)[13]

_____

[12]    As set forth in the City's charter, some main differences between an ordinance and a resolution are as follows: (1) except for certain categories of ordinances not at issue here, "ordinances . . . shall be passed by the Council only after twelve calendar days have elapsed from the day of their introduction" (San Diego City Charter, § 275, subd. (c)); and (2) resolutions generally become effective immediately upon their final passage, but with certain exceptions not relevant here, ordinances take effect "not less than thirty calendar days from the date of their final passage" (*Id*., § 295, subds. (c), (d)).

[13]    The last sentence of former section 99 was amended in 2016 to remove the public

SDOG contends that based on the undisputed fact that the Restated Lease was for a period of more than five years, the second sentence of former section 99 required the City to publish notice in the official newspaper, hold a public hearing and adopt an ordinance before entering into the Restated Lease.[14]

"Construing a city charter is a legal issue we review de novo. . . . Nonetheless, '[a]dministrative interpretations [of City Charter provisions] of longstanding are entitled to great weight unless they are plainly wrong.' . . . In reviewing an agency's interpretation of law we exercise our ' "*independent judgment* . . . , giving *deference* to the determination of the agency *appropriate* to the circumstances of the agency action." ' . . . '[E]vidence that the agency "has consistently maintained the interpretation in question, especially if [it] is long-standing" [citation], and "indications that the agency's interpretation was contemporaneous with legislative enactment of the statute being interpreted," ' warrant increased deference." (*Don't Cell Our Parks v. City of San Diego* (2018) 21 Cal.App.5th 338, 349-350 (*Don't Cell*), citations omitted.) "An interpretation of a Charter provision by an administrative agency charged with its implementation is entitled to great weight and respect unless shown to be clearly

---

notice and hearing requirement. The last sentence now states, "No contract, agreement or obligation extending for a period of more than five years may be authorized except by ordinance adopted by a two-thirds' majority vote of the members elected to the Council." (former § 99.)

14    As we have explained, the Restated Lease was approved by the City Council pursuant to a resolution (not an ordinance) on April 6, 2015, when the City Council authorized the mayor to enter into the Restated Lease, and there is no record of publication of notice in the official City newspaper prior to the hearing. The resolution was approved by over two-thirds of the council members.

33

erroneous."  (*Social Services Union v. City and County of San Francisco* (1991) 234 Cal.App.3d 1093, 1101 (*Social Services Union*).)

"The principles of construction that apply to statutes also apply to the interpretation of charter provisions."  (*Don't Cell, supra*, 21 Cal.App.5th at p. 349; see also *Domar Electric, Inc. v. City of Los Angeles* (1994) 9 Cal.4th 161, 171-172 (*Domar*), ["we construe the charter in the same manner as we would a statute"].)  The version of former section 99 in effect during 2015 was adopted by the electorate of San Diego as Proposition A in 1968.  " 'In construing a provision adopted by the voters our task is to ascertain the intent of the voters.'  . . .  'We look first to the language of the charter, giving effect to its plain meaning.  . . .  Where the words of the charter are clear, we may not add to or alter them to accomplish a purpose that does not appear on the face of the charter or from its legislative history.'  . . .  ' "An interpretation that renders related provisions nugatory must be avoided . . . [ ], [and] each sentence must be read . . . in the light of the [charter's overall] scheme.  . . ." '  . . .  'When statutory language is susceptible of more than one reasonable interpretation, courts should consider a variety of extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history including ballot pamphlets, public policy, contemporaneous administrative construction and the overall statutory scheme.' "  (*Don't Cell,* at p. 349, citations omitted.)  In determining whether a statute is susceptible to more than one meaning, "[t]he meaning of a statute may not be determined from a single word or sentence; the words must be construed in context, and provisions relating to the same subject matter must be

34

harmonized to the extent possible."  (*Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735 (*Lungren*).)

"Additional rules of statutory construction apply specifically to the interpretation of city charters.  The controlling principle governing charter cities is 'that by accepting the privilege of autonomous rule the city has all powers over municipal affairs, otherwise lawfully exercised, subject only to the *clear and explicit* limitations and restrictions contained in the charter. . . .  All rules of statutory construction as applied to charter provisions [citations] are subordinate to this controlling principle. . . .  A construction in favor of the exercise of the power and against the existence of any limitation or restriction thereon which is not expressly stated in the charter is clearly indicated.  So guided, reason dictates that the full exercise of the power is permitted except as clearly and explicitly curtailed.  Thus in construing the city's charter a restriction on the exercise of municipal power may not be implied.' "  (*Westsiders Opposed to Overdevelopment v. City of Los Angeles* (2018) 27 Cal.App.5th 1079, 1086-1087.)

Based on the rules of interpretation set forth above, our first task is to examine the language of former section 99 itself to determine whether it has a plain meaning or whether it is ambiguous.  If the provision is ambiguous, we may resort to additional tools of statutory interpretation to determine its meaning.  The particular language at issue states, "No contract, agreement or obligation extending for a period of more than five years may be authorized except by ordinance . . . ."  Our initial inquiry is whether "the words of the charter are clear," or whether, in contrast, the "statutory language is susceptible of more than one reasonable interpretation."  (*Don't Cell, supra*, 21

35

Cal.App.5th at p. 349.) SDOG contends the phrase unambiguously refers to *any* contract, agreement or obligation of the required duration. The City, in contrast, contends that the phrase is ambiguous and could refer only to contracts, agreements or obligations of the required duration *that require the City to expend funds*. The City contends that if such an interpretation is followed, it was not required to comply with former section 99 in approving the Restated Lease because the Restated Lease does not require the City to expend funds, and instead brings in revenue for the City.

Turning to the language of the provision, former section 99 consists of a single paragraph with two separate substantive provisions set forth in two separate sentences. Instead of focusing on the language of the second sentence *alone*, we interpret that language in the context of the entire section. "[E]ach sentence must be read . . . in the light of the [charter's overall] scheme" (*Don't Cell, supra*, 21 Cal.App.5th at p. 349), and "provisions relating to the same subject matter must be harmonized to the extent possible." (*Lungren, supra,* 45 Cal.3d at p. 735.) "[T]he plain meaning rule does not compel rote application of the common meaning of words *without regard to the context in which they are used*." (*County of Sacramento v. Pacific Gas & Elec. Co.* (1987) 193 Cal.App.3d 300, 309, italics added.) Here, the first sentence of former section 99 addresses the requirement of a public vote and the provision of an annual tax before the City "incur[s] any indebtedness or liability in any manner or for any purpose exceeding in any year the income and revenue provided for such year." (Former § 99.) Thus, put simply, the first sentence deals with the situation of the City entering into a contractual

36

agreement that creates an "*indebtedness or liability*" in a certain amount.[15]  The second

sentence, which is at issue here, refers to "[n]o contract, agreement or obligation

extending for a period of more than five years," but it fails to specify what *sort* of

contract is at issue.  Although there is no grammatical link between the two sentences that

would indicate the meaning of the second sentence is intended to be modified by

anything appearing in the first sentence, it is reasonable to believe that because the first

sentence immediately precedes the second sentence, and it refers only to situations in

which the City incurs "indebtedness or liability," a similar limitation could be implied in

the second sentence's reference to a "contract, agreement or obligation."  Under that

reading, the second sentence would refer only to contracts, agreements or obligations that

require the City to expend funds.  On the other hand, the second sentence could be read

as independent of the first sentence.  Under that reading, the second sentence would apply

to *any* contract, agreement or obligation in excess of five years.  Because there are *two*

reasonable readings of the second sentence of former section 99, the provision is

ambiguous.  Accordingly, we must resort to additional tools of statutory interpretation to

determine the statutory meaning.

---

[15]    The legislative history of the 1968 amendment to former section 99 shows that the first sentence of former section 99 was intended to mirror the debt limitation provisions currently set forth in Article XVI, section 18, of the California Constitution, which currently provides in part:  "No county, city, town, township, board of education, or school district, shall incur any indebtedness or liability in any manner or for any purpose exceeding in any year the income and revenue provided for such year, without the assent of two-thirds of the voters of the public entity voting at an election to be held for that purpose . . . ."

The most relevant principle of statutory interpretation applicable here is that " '[a]dministrative interpretations [of City Charter provisions] of longstanding are entitled to great weight unless they are plainly wrong,' " (*Don't Cell*, *supra*, 21 Cal.App.5th at p. 350.)  We accord "great weight and respect" to the City's interpretation of its own charter, "unless shown to be clearly erroneous." (*Social Services Union, supra,* 234 Cal.App.3d at p. 1101.)

As we understand from documents in the record, the City Attorney has since at least 1996 interpreted the second sentence of former section 99 to refer solely to contracts, agreements or obligations requiring the City to expend funds.  In several memoranda, the City Attorney's office has carefully considered the meaning of the second sentence of former section 99 and determined, based on its review of the legislative history and the surrounding statutory context of the provision, that it applies only when the City is entering into a contract with a term over five years that will require the City to expend funds.  The City's interpretation is not " 'plainly wrong' " (*Don't Cell*, *supra*, 21 Cal.App.5th at p. 350) and not "clearly erroneous" (*Social Services Union, supra,* 234 Cal.App.3d at p. 1101).  Specifically, we have explained that the interpretation is supported by the statutory language of section 99 when *both* sentences of that section are taken into account, as the first sentence refers to the City incurring "indebtedness or liability."  Moreover, we are unaware of any challenge having been made to the City's interpretation of former section 99 until the instant lawsuit was filed, which supports an inference that City's interpretation is reasonable.  (*Social Services Union*, *supra*, 234 Cal.App.3d at p. 1101 ["judicial deference to an administrative

38

construction is further encouraged by the absence of any challenge thereto over an extended period of time"].)

Further, the City's interpretation of former section 99 is consistent with the legislative history. The legislative history for former section 99 consists principally of the ballot pamphlet presented to the electorate in 1968 when former section 99 was adopted. In referring to the second sentence of former section 99, the ballot pamphlet stated, "This addition will enable the taxpayer to protest *long-term projects* not otherwise subject to a vote of the People." (Italics added.) It is reasonable for the City to have interpreted the reference to "long-term projects" in the legislative history to refer to contracts that will require the City to expend funds, rather than to *any* sort of long term contract, including a lease agreement for City-owned property. A lease agreement for City-owned property is not normally referred to as a "long-term project," but that description could easily be used to describe long-term contracts that require the City to expend funds, such as extensive infrastructure projects.

In sum, deferring to the City's reasonable interpretation of its charter, we conclude that the second sentence of former section 99, as it existed when the Restated Lease was adopted, applied only to contracts, agreements or obligations for a period of more than five years that required an expenditure of funds by the City. As the Restated Lease does

39

not require an expenditure of funds, SDOG has not established that the Restated Lease was approved by the City in violation of former section 99.[16]

DISPOSITION

The judgment is affirmed.

IRION, J.

WE CONCUR:

NARES, Acting P. J.

GUERRERO, J.

---

[16] SDOG makes a cursory argument that the Restated Lease requires the City to expend funds because it includes certain rent credits to Symphony. We reject the argument. The rent credits serve as a reduction on the amount of rent that Symphony is obligated to pay the City. They do not require the City to expend any funds.

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| SAN DIEGANS FOR OPEN GOVERNMENT,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>CITY OF SAN DIEGO,<br><br>    Defendant and Respondent,<br><br>SYMPHONY ASSET POOL XVI, LLC,<br><br>    Real Party in Interest and Respondent. | D073284<br><br><br>(Super. Ct. No. 37-2015-00015780-CU-TT-CTL)<br><br><br><br><br>ORDER CERTIFYING OPINION FOR PUBLICATION |

THE COURT:

The opinion in this case filed December 27, 2018 was not certified for publication. It appearing the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c), the request pursuant to rule 8.1120(a) for publication is GRANTED.

IT IS HEREBY CERTIFIED that the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c); and

ORDERED that the words "Not to Be Published in the Official Reports" appearing on page one of said opinion be deleted and the opinion herein be published in the Official Reports.

NARES, Acting P. J.

Copies to: All parties