Filed 10/1/20

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| In re J.P., a Person Coming Under the Juvenile Court Law. | H047586 (Santa Clara County Super. Ct. No. 17JD024630) |
| SANTA CLARA COUNTY DEPARTMENT OF FAMILY AND CHILDREN'S SERVICES, Plaintiff and Respondent, v. M.D., Defendant and Appellant. | |

M.D. (mother) appeals from the juvenile court's order granting her ex-boyfriend (Albert) presumed parent status for her son, J.P.  Mother argues that the juvenile court did not have the authority under Welfare and Institutions Code section 385[1] to reconsider its prior order in which it found that Albert did not qualify as a presumed parent to J.P.

We disagree and conclude that the juvenile court had the authority to revisit its prior ruling.  Accordingly, we will affirm the juvenile court's order finding Albert to be a presumed parent.

---

[1] Unspecified statutory references are to the Welfare and Institutions Code.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    *Events leading to October 2018 visitation order*[2]

"On July 14, 2017, the Santa Clara County Department of Family and Children's Services (Department) filed a petition under Welfare and Institutions Code section 300, subdivision (b)(1) alleging that J.P. (born in 2013) came under the juvenile court's jurisdiction. The petition alleged that mother had been arrested for driving under the influence. J.P. and his younger half brother, A.A., were taken into protective custody.

"Albert's stepmother said that Albert, mother, J.P., and A.A. lived with her from September or October 2016 through February or March 2017. Albert told the social worker that he was not J.P.'s biological father but wanted to legally adopt him. Albert was A.A.'s biological father. J.P.'s biological father, L.P., was not involved in J.P.'s life, but he was ordered to pay child support for J.P.

"At the initial hearing on the dependency petition, the juvenile court found Albert to be A.A.'s presumed father and found L.P. to be J.P.'s presumed father. The juvenile court further found that a prima facie showing had been made that both children came within its jurisdiction and ordered them removed from mother and Albert's custody.

"During interviews, Albert indicated to the Department that he wanted to be designated as J.P.'s presumed parent. Mother and Albert had separated during the dependency proceedings and did not intend to resume their relationship. Albert said that J.P. called him 'dad,' and he referred to J.P. as his son even though he was not J.P.'s biological father. Mother claimed that Albert had problems with alcohol, smoked heavily, and scared the children when he got into loud arguments. The Department determined that mother had a 'long-standing alcohol issue' and Albert was

---

[2] Following mother's appeal, we affirmed the October 2018 visitation order in a published decision, *In re J.P.* (2019) 37 Cal.App.5th 1111. On our own motion, we take judicial notice of that opinion and the record (H046491) underlying it. (Evid. Code, §§ 451, subd. (a), 452, subd. (d), 459, subd. (a).)

'well-intentioned' but had a difficult time maintaining boundaries with mother to keep the children safe.  The Department further determined that Albert had prior instances where he drank excessively.

"Before the jurisdictional hearing, mother alleged that Albert had committed domestic violence against her.  Albert denied the allegations of abuse but conceded that he got into verbal altercations with mother.  Mother had requested a restraining order against Albert, and a temporary restraining order was in effect at the time the Department prepared its addendum to the jurisdictional report.  Police had responded several times to reports of disturbances between mother and Albert.

"On August 23, 2017, the juvenile court held a jurisdictional hearing and found the allegations in the dependency petition to be true.  The court held a dispositional hearing several weeks later and declared both J.P. and A.A. to be dependents of the court.  Services were ordered for mother and Albert.  For J.P., the juvenile court ordered supervised visits with mother and L.P.  For A.A., the juvenile court ordered supervised visits with mother and Albert.

"In November 2017, J.P. and A.A. were moved from their foster home placement to their paternal grandparents' (Albert's parents') home.  L.P. had not made his whereabouts known to the Department, and he had not had any visits with J.P.

"In preparation for the six-month review, the Department prepared a status review report that recommended J.P. be returned to mother's care under a plan of family maintenance and services for L.P. be terminated.  The Department also recommended A.A. be returned to both mother and Albert and family maintenance be offered for mother and Albert's separate households.  According to the report, the domestic violence case initiated by mother against Albert had been dismissed.  Both parents had been consistent with visiting both children, and the Department believed the quality of visits was good.  The children 'show[ed] comfort' in Albert's presence, and Albert appeared to be hands-on with the children when they were with him.  Albert ensured that the children

3

were fed, took them to local parks, and appeared to provide for their basic needs such as clothing and food.  On March 27, 2018, the juvenile court adopted the Department's recommendations at the six-month review hearing.

"On September 24, 2018, the Department filed a status review report.  The report recommended that the juvenile court continue to offer family maintenance services to mother and Albert.  During the review period, seven referrals of child abuse had been made concerning J.P. and A.A.  The Department found most of the referrals to be unfounded and the remaining referrals to be inconclusive.  J.P. had previously visited Albert with A.A., but he had not visited Albert for several months pursuant to mother's request.  Albert did not have court-ordered visits with J.P.

"Also on September 24, 2018, Albert asked the juvenile court to recognize him as J.P.'s presumed father.  Subsequently, the court held a contested hearing on Albert's request.

"During the presumed parenthood hearing, Albert testified about his relationship with J.P.  Albert said that he met J.P. when the child was approximately three years old, sometime in 2016.  Albert lived with mother and J.P. for approximately one and a half to two years.  During that time, Albert developed a close relationship with J.P.  Albert spent weekends with J.P. and mother, and Albert provided financial support for them, with the majority of the money that Albert earned going toward paying the family's bills.  J.P. used to call Albert 'daddy.'  In a recent encounter, Albert saw J.P. and tried to hug him, but mother pulled J.P. away from Albert and told J.P., ' "That's not your father, that's just [Albert]." '  Albert referred to J.P. as his son and openly told others that he considered J.P. to be his son.  Albert said that he was willing to financially provide for J.P.

"Mother also testified at the hearing and disputed Albert's testimony.  Mother said that Albert lived 'off and on' with her and the children, and he would come and go as he pleased.  He sometimes stayed overnight but would start arguments and would leave after

4

getting drunk. Mother said that Albert did not provide financial support to A.A. or to mother after A.A. was born. According to mother, Albert did not spend one-on-one time with J.P. Mother conceded that Albert paid some of her rent for several months after A.A. was born. Mother, however, claimed that she later gave Albert money to pay rent, but he took the money and did not pay rent, forcing mother to be evicted from her apartment. According to mother, J.P. never asked for Albert. Mother also said that J.P. told him that Albert 'kissed' him during a prior overnight visit, which left a mark behind J.P.'s ear.

"On October 25, 2018, the juvenile court determined that Albert did not qualify as J.P.'s presumed father under Family Code section 7611, subdivision (d). The juvenile court observed that Albert did not seek presumed parenthood status for more than a year after the dependency proceedings began, he was not J.P.'s primary caregiver, and he did not take consistent financial responsibility for J.P. The juvenile court, however, noted that this case was 'a little bit of a close call' and stated that there was 'no doubt' that there was a bond between Albert and J.P. The juvenile court further observed that even if Albert qualified as a presumed parent under Family Code section 7611, subdivision (d), he would not qualify as a *third parent* (L.P. was J.P.'s presumed father) under Family Code section 7612, subdivision (c). Under Family Code section 7612, subdivision (c), a juvenile court may find that a child has a third parent if 'recognizing only two parents would be detrimental to the child.' The juvenile court explained that there was insufficient evidence of detriment to J.P. under Family Code section 7612, subdivision (c), but acknowledged that its decision did not imply that J.P. did not suffer from 'some detrimental [e]ffect' due to his separation from Albert.

"After the juvenile court made its presumed parenthood determination, Albert requested regular visitation with J.P. Mother opposed the visitation request, arguing that J.P. was doing 'quite well' without seeing Albert. She also did not believe that the sibling bond between J.P. and A.A. suffered from J.P. not visiting with Albert.

5

Mother also claimed that J.P. already had other 'strong, male figures' in his life aside from Albert.  J.P.'s attorney expressed conflicting feelings about visitation between Albert and J.P.  J.P.'s attorney stated that she believed visitation would be in J.P.'s best interest in the short term, but if visits were to cease, J.P. would suffer from losing Albert from his life.  The Department argued in favor of visitation between Albert and J.P., noting that J.P. and A.A. used to visit Albert together, and J.P. had a bond with Albert.  The Department argued that it was not necessarily asking for an additional visit but was requesting that the trial court order that if A.A. went to visit Albert, J.P. could also come along.

"After considering these arguments, the juvenile court determined that there was a bond between J.P. and Albert, and the relationship was good.  The juvenile court also concluded that it would be in J.P.'s best interest to maintain his relationship with Albert.  After concluding that visitation would be in J.P.'s best interest, the juvenile court ordered weekly visitation between J.P. and Albert, which the juvenile court clarified could occur when A.A. visited Albert."  (*In re J.P.*, *supra*, 37 Cal.App.5th at pp. 1114-1117.)

### B. Events leading to October 2019 order

At a March 18, 2019 family maintenance review hearing, mother requested mediation on the issue of visitation between J.P. and Albert upon dismissal of the dependency action.  The mediation was unsuccessful, so the matter was continued to June 18 and 19, 2019 for a contested hearing.

Prior to the contested hearing, Albert renewed his request to be considered a de facto parent to J.P.  The Department did not oppose Albert's request, but took the position that de facto parent status was not a prerequisite for the court ordering continued visitation with J.P.  Counsel for the children supported Albert's request for de facto parent status and for continued visitation with J.P.

At the hearing, Albert testified that he considers himself to have a "parental" relationship with J.P.  When he and mother were together, Albert intended to adopt J.P.

6

In the months before the dependency proceedings began, after he and mother had split up, mother allowed Albert to take both A.A. and J.P. with him for visits. Mother was encouraging J.P.'s relationship with Albert, telling him to " 'Go ask Daddy,' " if he wanted something.

J.P. and A.A. were placed with Albert's father and stepmother in the course of the dependency proceedings, and J.P. referred to them as "Bompa" and "Nana." After the children were returned to the custody of mother, Albert had some overnight visits with them, but in April 2018, Albert was in an automobile accident and was on bed rest for two months. He and mother agreed that it would be better to suspend visits with both children until he was recovered. At the end of that two-month period, however, mother said she did not want J.P. visiting Albert anymore because Albert "was not his father." A few months later, Albert filed his initial request to be considered a presumed parent to J.P.

According to Albert, once mother regained custody of J.P., she began telling J.P. that Albert is not his father. J.P. now says, " 'Hey, guy[] [or] Hey, you' " when addressing him, and in front of mother, J.P. calls him " 'Albert.' " Mother did not allow J.P. to visit with Albert from the end of October 2018 to January 2019—despite a court order—and when the visits resumed, J.P. was "distant, standoffish . . . very quiet, very shy." His demeanor improved "[d]ramatically" as their visits became more consistent. J.P. was more "selfish" when the visits resumed but now "he's mellowed out . . . embraces everybody . . . [and is] very well-mannered." J.P. "still antagonizes his brother, but it's . . . more controlled now," whereas it was previously "reckless." Albert disciplines J.P. with time-outs as necessary and talks with him afterwards to make sure J.P. understands why he was put in a time-out. Albert makes sure that he disciplines both J.P. and A.A. in an equitable manner and he thinks J.P. "sees that, and . . . knows that it's not just him . . . [who is] disciplined."

Mother testified she began dating Albert around the time that J.P. turned two years old. She and Albert never lived together though he would occasionally spend the night at her place. Once she became pregnant with A.A., they began arguing more and broke up. Mother "realize[d] [Albert] drank a lot more than expected." Albert did stay at her house for "one week . . . after [A.A.] was born" but he "took off" after they argued. To her knowledge, Albert otherwise lived in his car, at his uncle's house, or perhaps slept on his parents' couch. Mother testified that when she and Albert were dating, he never read to J.P., played with him, or took him out for walks.

J.P.'s maternal grandmother also testified and said that Albert did not ever live with mother while they were dating. She also never saw him help with J.P. or mother's older children. The maternal grandmother admitted that she moved to, and has been living in, Missouri since August 2016.

Albert's stepmother was called to testify by J.P.'s counsel. She said that she considers both J.P. and A.A. to be her grandsons. As of the date of the hearing, J.P. called her "Hey," but before the end of 2018 he had been calling her "Nana." Mother, J.P., and A.A. all lived in her house for a period of time, and then the two boys lived with her for about a year in the course of the dependency. During that time, she saw Albert caring for J.P. like a son, nurturing and guiding him. J.P. would refer to Albert as "daddy" during that period. Whenever J.P. was scheduled for a visit with Albert, he "was always excited to do it." At the end of the visits, J.P. seemed reluctant to leave.

After the parties submitted, the court stated that it needed more time to review the evidence presented and the case law. The parties agreed to return at a later date for the court's decision.

At the continued hearing, the court advised the parties that in its efforts to reach a decision, it now believed the record supported a finding that Albert qualified as a presumed parent to J.P. Accordingly, it asked the parties to brief whether the court had

8

the authority to reconsider its prior ruling on that question as well as whether the evidence supported such a finding. The matter was continued to October 23, 2019.

In her briefing and at the hearing, mother did not dispute the court's authority to revisit its prior order pursuant to section 385, but she instead argued the evidence did not support granting presumed parent status to Albert. Both the Department and J.P.'s counsel were in favor of finding Albert to be a presumed parent to J.P.

After hearing argument, the court concluded that it had the authority under section 385 to sua sponte reconsider its prior order on Albert's request for presumed parent status. The court noted that "the goal of dependency is to protect children" and because "the facts can change . . . it is important to be able to adapt to the changed landscape in order to ensure that the child's best interest is being served." Having previously denied Albert's application to be a presume parent to J.P. in a "close case," the court found, on reexamining the evidence presented in October 2018 as well as the evidence presented at the most recent contested hearing, that "the case is no longer close, and [Albert] does qualify" as a presumed parent.[3]

The court observed that "mother has denied that [Albert] lived with [J.P.] and has denied the bond between [Albert] and [J.P.]" However, the court "did not find and continue[s] to not find [mother's] statements credible." The court specifically noted that mother "refused to allow [Albert] to visit [J.P.] for months prior to the October 2018 trial, and . . . continued to deny him visitation for months despite the court's [October 2018 visitation] order."

Finally, the court explained that "it was not made clear at the 2018 trial why [Albert] had waited a year to ask for paternity status" and this was a basis for denying his request. At the 2019 trial, however, the evidence showed that mother had been allowing Albert to act as a parent to J.P. until April 2018 when Albert was injured in an

---

[3] The court also "acknowledge[d] that [Albert] probably should have been found a [presumed parent] back in October [2018]."

9

automobile accident and they agreed to stop visitation until he recovered. After Albert recovered, mother did not allow the children to resume visiting with him, and it was at that point that Albert sought presumed parent status. Consequently, the court found that Albert's "failure to [seek a paternity ruling] was not based on any ambivalence towards his parental role, but on having misplaced faith in the mother's ongoing recognition of his relationship to [J.P.]"

The court also found that it would be "detrimental to [J.P.] to recognize only two parents," especially since "[L.P.], despite his status, does not have a parental role in [J.P.]'s life[,] . . . and . . . has no relationship with [J.P.]" In contrast to the evidence presented at the October 2018 hearing, the "social worker's report of June 18, 2019, outlines a number of facts demonstrating detriment to [J.P.] from the severing of the relationship he had with [Albert]." J.P. "became more reserved once visits were cut off[,] . . . suffer[ed] emotionally from the loss of contact, and . . . show[ed] increased behaviors at school and difficulty socializing with his peers." In addition, the court was concerned that "mother has engaged in conduct to alienate [J.P.] from [Albert,] . . . [and] it's clear that the mother cannot be counted on to give [Albert] visits, given her refusal to follow court orders after the October 2018 trial."

Mother timely appealed.

## II. DISCUSSION

Mother argues that the juvenile court erred by finding it was authorized to reconsider its parentage order under section 385 because Family Code section 7636, as well as principles of res judicata and collateral estoppel, absolutely preclude such reconsideration.[4] As explained below, we disagree.

---

[4] In her briefing, mother challenges only the juvenile court's authority to reconsider and modify its prior order. She does not argue that the evidence presented at the June 2019 contested hearing did not support the juvenile court's finding that Albert qualified as a presumed parent to J.P.

10

*A.      Standard of review*

Because the issue presented involves the interpretation of statutes and the application of those statutes to undisputed facts, it is subject to this court's independent review.  (*City of Saratoga v. Hinz* (2004) 115 Cal.App.4th 1202, 1212, citing *People ex rel. Lockyer v. Shamrock Foods Co*. (2000) 24 Cal.4th 415, 432.)  The "fundamental task" of the court in any act of statutory interpretation "is to ascertain the intent of the lawmakers so as to effectuate the purpose of the statute."  (*Estate of Griswold* (2001) 25 Cal.4th 904, 910.)  Our inquiry begins " 'by examining the statutory language, giving the words their usual and ordinary meaning.' " (*Id*. at p. 911.)  However, the plain "meaning of a statute may not be determined from a single word or sentence; the words must be construed in context, and provisions relating to the same subject matter must be harmonized to the extent possible." (*Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735.)

*B.      Interplay between juvenile court and family court*

Family court and juvenile court serve different purposes.  (*In re Chantal S*. (1996) 13 Cal.4th 196, 200-201.)  "The family court is established to provide parents a forum in which to resolve, inter alia, private issues relating to the custody of and visitation with children. . . .  The juvenile court, by contrast, provides the state a forum to 'restrict parental behavior regarding children, . . . and . . . to remove children from the custody of their parents and guardians.' " (*Id*. at p. 201.)

The overarching purpose of the dependency system is to " ' " 'maximize a child's opportunity to develop into a stable, well-adjusted adult.' " ' " (*In re Joshua A*. (2015) 239 Cal.App.4th 208, 218.)  "The best interest of the child is the fundamental goal of the juvenile dependency system . . . ." (*In re William B*. (2008) 163 Cal.App.4th 1220, 1227.)  The juvenile court has the special responsibility to consider the totality of a child's circumstances, "including the maintenance of relationships with other adults with whom [the child has] a strong bond." (*In re J.T*. (2014) 228 Cal.App.4th 953, 964.) "Within its limited jurisdiction, the authority of the juvenile court is extensive:

11

'In addition to all other powers granted by law, the juvenile court may direct all such orders to the parent, parents, or guardian of a minor who is subject to any proceedings under this chapter as the court deems necessary and proper for the best interests of or for the rehabilitation of the minor.' (§ 245.5.)" (*Nickolas F*. *v*. *Superior Court* (2006) 144 Cal.App.4th 92, 111.)

Although family court and dependency court serve different purposes, when it comes to questions of parentage, both systems utilize the Uniform Parentage Act (UPA) (Fam. Code, § 7600 et seq.). The UPA "provides the framework by which California courts make paternity determinations." (*Dawn D*. *v*. *Superior Court* (1998) 17 Cal.4th 932, 937.) Where a dependency petition has been filed, the juvenile court is vested "with exclusive responsibility for determining the identity of presumed parents" by section 316.2.[5] (*In re Alexander P*. (2016) 4 Cal.App.5th 475, 487 (*Alexander P*.).) This exclusivity is essential because, "inasmuch as a dependency action could eventually result in the termination of parental rights, a court needs first to know the identities of the parents. The legal parents must be identified so that they may receive notice of the hearing; be provided counsel, if necessary; and be accorded a meaningful opportunity to be heard." (*In re Jesusa V*. (2004) 32 Cal.4th 588, 620.) The juvenile court's exclusive jurisdiction over parentage determinations inheres "from the time the petition is filed until the petition is dismissed, the dependency is terminated, or parental rights are terminated." (*Ibid*.)

---

[5] "After a petition has been filed to declare a child a dependent of the court, and until the time that the petition is dismissed, . . . the juvenile court which has jurisdiction of the dependency action shall have exclusive jurisdiction to hear an action filed under Section 7630 or 7631 of the Family Code." (§ 316.2, subd. (e).)

*C.      Authority to reconsider prior orders*

Section 385 authorizes the juvenile court to change, modify or set aside its prior orders sua sponte.[6] Within the scope of a dependency proceeding, the juvenile court has broad authority under section 385 to reconsider and change its prior orders. As discussed above, however, even in dependency proceedings, the juvenile court must utilize the UPA with respect to parentage determinations.

Family Code section 7636, which is a part of the UPA, provides: "The judgment or order of the court determining the existence or nonexistence of the parent and child relationship is determinative for all purposes except for actions brought pursuant to Section 270 of the Penal Code."[7] In parentage proceedings, this statute embodies the common law doctrine of res judicata and collateral estoppel. (*Alexander P.*, *supra*, 4 Cal.App.5th at p. 490.)

On its face, it appears that the finality afforded to parentage determinations under Family Code section 7636 would operate to supersede the juvenile court's authority under section 385 to sua sponte reconsider and modify its prior parentage orders. Assuming without deciding that it did, however, another provision of the UPA expressly bestows upon the juvenile court the same authority as is granted by section 385.

Family Code section 7642, which is also a part of the UPA, provides, "The court has continuing jurisdiction to modify or set aside a judgment or order made under this part." The plain language of this statute confers at least as broad an authority as that afforded to the juvenile court under section 385.

In her reply brief, mother cites *Scott v. Superior Court* (2009) 171 Cal.App.4th 540 (*Scott*) for the proposition that Family Code section 7642 has been "judicially

---

[6] "Any order made by the court in the case of any person subject to its jurisdiction may at any time be changed, modified, or set aside, as the judge deems meet and proper, subject to such procedural requirements as are imposed by this article." (§ 385.)

[7] There is no dispute that this action was not brought pursuant to Penal Code section 270, which imposes criminal liability for failing to provide for a child.

13

interpreted as providing the family court with authority to modify prior findings and orders *only* where one of the child's parents seeks modification and not where a third party seeks such a modification."  Even if *Scott* could be read so expansively, the case is distinguishable.

In *Scott*, the father had been awarded sole legal and physical custody of his children.  The father's longtime girlfriend sought custody and visitation with the father's biological children after the relationship ended and he and the children moved away.  The superior court granted the girlfriend's petition for joinder and directed the parties to mediation on custody and visitation, but the Court of Appeal reversed, finding the girlfriend lacked standing to be joined.  (*Scott*, *supra*, 171 Cal.App.4th at p. 544.)  The court determined that " '[a] nonparent seeking custody . . . lacks standing to initiate a custody proceeding under the Family Code,' " because the custody provisions of the Family Code " 'have been held not to provide an independent basis for subject matter jurisdiction.' "  (*Id*. at p. 546.)  The girlfriend was "seek[ing] to gain custody of the children by injecting herself into the inactive UPA action in which the issue of custody was settled years ago."  (*Id*. at p. 547.)

The *Scott* court briefly addressed why it believed Family Code section 7642 was of no assistance to the girlfriend, stating "Although the superior court has continuing jurisdiction to modify or set aside a judgment made under the UPA ([Fam. Code,] § 7642), there is nothing in the appellate record indicating [the father and the mother] are seeking to modify or set aside the judgment concerning their child custody arrangement.  Indeed, [the girlfriend] acknowledges 'there are no other matters currently before the court in the [UPA] action . . . .' "  (*Scott*, *supra*, 171 Cal.App.4th at p. 547.)

In this case, however, we are not dealing with an "inactive UPA action" in which the question of presumed parentage was "settled years ago."  (*Scott*, *supra*, 171 Cal.App.4th at p. 547.)  The question of Albert's status as a presumed parent under the UPA was addressed in the course of the dependency proceeding involving J.P. and A.A.

14

In that *ongoing* dependency proceeding, the juvenile court had cause to question whether its prior decision on Albert's status as a presumed parent was correct. After providing the parties with notice and an opportunity to be heard, the juvenile court concluded: (1) it had the authority to reconsider its prior order; and (2) upon reconsideration, the evidence showed that Albert did qualify as a presumed parent to J.P. There was no break in the court's jurisdiction over any of the parties involved and certainly no "inactive UPA action" which Albert or the juvenile court sought to resurrect.

The matter is also not foreclosed by operation of res judicata or collateral estoppel. Those common law principles are embodied in Family Code section 7636 (*Alexander P.*, *supra*, 4 Cal.App.5th at p. 490) and are thus similarly subject to the expansive authority to modify or set aside judgments or orders under the UPA set forth under Family Code section 7642.[8]

Here, the juvenile court determined, based on the evidence presented at the June 2019 contested hearing, that its prior order denying presumed parent status to Albert should be modified. Pursuant to Family Code section 7642, it was authorized to reconsider that order.

## III.    DISPOSITION

The juvenile court's order is affirmed.

---

[8] Obviously, such judgments or orders will be final at *some* point in time, but we need not opine on precisely where that line should be drawn. Under the circumstances of this case—where it is undisputed that the juvenile court had continuing jurisdiction over the parties to an ongoing dependency proceeding—the line had not yet been crossed.

_____
                                    Premo, Acting P.J.


WE CONCUR:




_____
            Elia, J.




_____
      Bamattre-Manoukian, J.




In re J.P.; DFCS v. M.D.
H047586

| | |
|---|---|
| Trial Court: | Santa Clara County Superior Court<br>Superior Court No. 17JD024630 |
| Trial Judge: | Hon. Amber S. Rosen |
| Counsel for Plaintiff/Respondent:<br>Santa Clara County Department of<br>Family and Children's Services | James R. Williams, County Counsel<br>Susan P. Greenberg, Deputy County Counsel |
| Counsel for Minor:<br>J.P. | No appearance for Minor |
| Counsel for Defendant/Appellant:<br>M.D. | Under appointment by the Court of Appeal<br>Leslie A. Barry |

In re J.P.; DFCS v. M.D.
H047586